**ROYAL INDEMNITY COMPANY,**
Plaintiff,

v.

**WESTINGHOUSE ELECTRIC CORPO-
RATION,** Defendant.

No. 72 Civil 375.

United States District Court,
S. D. New York.

Oct. 15, 1974.

Gwertzman, Sessler, Nagelberg & Pfeffer, New York City, for plaintiff; Max J. Gwertzman, New York City, of counsel.

Townley, Updike, Carter & Rodgers, New York City, for defendant; Philip D. Pakula, Joseph F. Kelly, Jr., New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Defendant Westinghouse Electric Corporation ("Westinghouse") moves for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, in this action brought by plaintiff as subrogee of Public Service Electric and Gas Company of New Jersey ("PSE&G"). The controversy centers about the breakdown of a turbine generator manufactured by Westinghouse for PSE&G and installed at its Hudson generating plant in Jersey City, New Jersey. Plaintiff seeks to recover $475,800 which it paid to PSE&G, pursuant to the terms of an insurance policy issued in favor of PSE&G, for 127 days loss of use of the generator during the period it was out of service. The complaint alleges the breakdown was the result of defendant's breaches of contract, breaches of warranty, or negligent acts or omissions by Westinghouse in the design, manufacture, installation and testing of the generator. Westinghouse contends that it fulfilled its obligation under its contract with PSE&G by making the repairs without charge to PSE&G; further, that in any event, under the express provisions of the contract, it is not liable for consequential damages which plaintiff seeks to recover in this action. The parties agree that in this diversity suit the substantive law of New Jersey applies.[1]

The following essential facts appear from the affidavits submitted on this motion. After preliminary discussions and correspondence which extended over several years, during which PSE&G received an option to purchase subject to cancellation, Westinghouse, by letter dated November 5, 1964, quoted to PSE&G a price of $10,125,687 for a 600 megawatt generator with stated specifications. That letter specified "[s]tandard conditions of sale as outlined in [Westinghouse's] Price List

1. *See* Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

1252 dated September 21, 1964 will apply." Price List 1252 was enclosed in the letter. PSE&G, by letter dated November 13, 1964, accepted the proposal. PSE&G, in its letter of acceptance, specifically noted "[s]tandard conditions of sale as outlined in your Price List 1252 dated September 21, 1964 will apply," and further, "[t]he cancellation clause contained in your proposal of April 5, 1961 is hereby eliminated and *this shall be a firm contract.*" (emphasis supplied.)

A further exchange of correspondence resulted in an increase in the unit's size to 620 megawatts, other technical changes and a price increase. Westinghouse, in its letter of January 5, 1965, proposing these changes, noted: "[a]ll other terms and conditions as stipulated in our letter of November 5, 1964 and your letter of November 13, 1964 remain the same." PSE&G accepted the proposal by letter to Westinghouse dated February 18, 1965, and also stated, "[a]ll other terms and conditions of the contract remain unchanged."

 This exchange of correspondence so clearly defines the contractual relationship of the parties that it borders on the absurd for plaintiff, through its counsel who obviously is without personal knowledge of what transpired between PSE&G and Westinghouse, to argue, as plaintiff does, "that there was no formal contract" between the parties, but merely an option, negotiations and exchange of letters. The day is long past when a red ribbon and seal is required upon documents which contain the terms of the parties' agreements in order to validate such agreements. This agreement was reached after arms length bargaining, emphasized by PSE&G in its letter of November 13, 1964, that "this shall be a firm contract." It is no less firm because the parties did not thereafter sign a formal document containing "whereases" and "the party of the first part" and "the party of the second part."[2]

The attempt by plaintiff to defeat summary judgment upon its claim that there is an issue of fact as to the existence of a contract between plaintiff's subrogor and Westinghouse is so transparent as to require no further discussion in the light of the documentary proof referred to above. The court finds that Westinghouse and PSE&G concluded an agreement, the terms of which are set forth in the exchange of correspondence referred to above.

We turn to the provisions of the agreement to consider the respective contentions of the parties. The agreement of the parties contains warranty and limitation of liability provisions, which if enforceable are sufficient to defeat plaintiff's claims for recovery. Price List 1252 contains a warranty by Westinghouse that the equipment shall be free of defects in workmanship or material, and that Westinghouse would, upon notification, correct any non-conformities that appear within one year after completion of shipment or installation. It further provided:

"This warranty is in lieu of all warranties of merchantability, fitness for purpose, or other warranties, express or implied, except of title and against patent infringement. *Correction of nonconformities, in the manner and for the period of time provided above, shall constitute fulfillment of all liabilities of Westinghouse to the purchaser, whether based on contract, negligence or otherwise with respect to, or arising out of such equipment.* [emphasis supplied]

*Limitation of Liability*

Neither party shall be liable for special, indirect, or consequential damages. The remedies of the purchaser set forth herein are exclusive, *and the liability of Westinghouse with respect to any contract or sale or anything done in connection therewith, whether in contract, in tort, under any warran-*

---

2. *See* 12A N.J.S.A. § 2–204(1); Comerata v. Chaumont, Inc., 52 N.J.Super. 299, 145 A.2d 471, 475 (1958).

*ty, or otherwise, shall not, except as expressly provided herein, exceed the price of the equipment or part on which such liability is based."* [emphasis supplied]

Price List 1252 included by reference the conditions stated in Westinghouse's Installation Services Form 29282B. This provision, applicable to the services of a Westinghouse field engineer in connection with the installation of the unit, provides:

"Westinghouse warrants that the recommendations of the Field Engineer shall accurately reflect the best judgment of a qualified engineer in the premises, but no other warranty or obligation of any kind shall extend thereto or be implied therefrom and Westinghouse shall not be liable for any act or omission of those not its employes nor for any injury, loss, damage, delay, failure to operate, or other thing whatsoever due in whole or in part to any cause other than the failure of its engineering recommendations to fulfill such warranty. *The liability of Westinghouse with respect to the Field Engineer's services shall not, in any event, exceed the cost of correcting defects in the apparatus, and Westinghouse shall not be liable for consequential damages."* [emphasis supplied]

It is undisputed that Westinghouse made the repairs upon notice to it from defendant and without cost.[3] Thus, under the clear and unambiguous provisions noted above, plaintiff's claims are foreclosed.

 Plaintiff, however, seeks to avert the force of these definitive and unambiguous provisions upon a statement by its attorney that "there is no definite evidence that the so-called exculpatory clauses were ever agreed upon and that specific notice thereof was brought home to plaintiff's subrogor."[4] To urge, in an effort to create an issue of fact, that these provisions were not "brought home" to PSE&G flies in the face of documentary proof. Plaintiff's subrogor, in its letter of November 13, 1964, specifically identified and referred to Price List 1252 as constituting part of the agreement between the parties. This was an adoption substantially in haec verba of Westinghouse's reference to the list in its letter of November 5, in which the list was enclosed. The salutary purpose of Rule 56 and its requirement that "affidavits shall be made on personal knowledge, [and] shall set forth such facts as would be admissible in evidence,"[5] cannot be aborted by conjectures of plaintiff's attorney, who is without personal knowledge of the facts and is an incompetent witness on the subject.[6] Lawyers for litigants cannot defeat one's right to summary judgment by "superinducing the idea" that a genuine issue of fact exists when one does not exist.[7]

Significantly, plaintiff has submitted no affidavit from any representative of PSE&G who, with knowledge of the transaction, challenges the integrity of the documents constituting the contract between PSE&G and Westinghouse. To the extent, then, that plaintiff argues that it did not agree to the terms referred to in those documents, its argument is foreclosed by the well-settled principle, tempered only by recent applications of the doctrine of unconsciona-

3. The assertion in plaintiff's statement, filed pursuant to General Rule 9(g), "[t]hat the defendant . . . billed the plaintiff's subrogor for the cost of repair," is without factual or evidentiary support in plaintiff's affidavits. Moreover, that the subrogor may have been "billed" does not mean that it paid any sum to defendant for the repairs.

4. Affidavit of Max J. Gwertzman in Opposition ¶ 6.

5. Fed.R.Civ.P. 56(e).

6. *See* Union Ins. Soc. v. William Gluckin & Co., 353 F.2d 946, 952 (2d Cir. 1965); Sylvester v. Morgan, 125 F.Supp. 380, 389–390 (S.D.N.Y.1954), aff'd, 220 F.2d 758 (2d Cir. 1955).

7. *Cf.* Hycon Mfg. Co. v. H. Koch & Sons, 219 F.2d 353 (9th Cir.), cert. denied, 349 U.S. 953, 75 S.Ct. 881, 90 L.Ed. 1278 (1955).

bility, "that affixing a signature to a contract creates a conclusive presumption, except as against fraud, that the signer read, understood, and assented to its terms" [8]—or as stated more recently by another court, "in the absence of fraud, one who does not choose to read a contract before signing it cannot later relieve himself of its burdens." [9]

Plaintiff argues further in its attempt to free itself of the exculpatory provisions that those provisions are inconsistent with specifications submitted by PSE&G to Westinghouse on January 11, 1966, fourteen months after it agreed to the exculpatory provisions. Defendant contends that these specifications concern an erection contract—one entirely different from that here involved, and that these specifications, part of a purchase order, cover neither the manufacture, the installation nor the testing of the generator. It is unnecessary to pass upon this contention, since nothing on the face of the documents or in any affidavit supports a finding that they are inconsistent with the exculpatory clauses, or limit, modify or vary them in any respect.

Plaintiff also contends that defendant's failure to mention negligence in its disclaimer precludes defendant from avoiding plaintiff's negligence claim. This contention is wholly without merit. The disclaimer set forth in Price List 1252 clearly mentions negligence; and while the exculpatory provision contained in Installation Services Form 29282B does not refer specifically to negligence, the intent to include actions based on negligence in that disclaimer is clearly "evident from the ar-rangements of the parties." [10] Both provisions expressly provide that defendant would not be liable for consequential damages.

Finally, plaintiff urges that the exculpatory clauses should not be enforced because they (1) are unconscionable, and (2) are contrary to public policy since PSE&G is a public utility, subject to regulatory control, and is affected with a public interest. Neither claim is valid upon the facts here presented.

In support of its claim that the exculpatory clauses are unconscionable, plaintiff relies upon the fact that only two companies in the United States were equipped to provide a generator of the type required. A further claim is made that the exculpatory clauses appear in fine print. Plaintiff's attorney seeks to ward off summary judgment upon a contention that once he has raised the question of unconscionability, "the Court has the inherent power to take testimony as to the relative positions of the parties involved to determine whether, in fact, unconscionability can be raised."

Unconscionability is a question of law,[11] although to be sure its resolution depends upon underlying questions of fact. Since limitation of consequential damages where the loss is commercial is not prima facie unconscionable,[12] plaintiff must raise genuine factual issues, the determination of which are germane to the claim of unconscionability. This was no purchase of a passenger ticket, a coffee percolator, a washing machine or an automobile. This was no take-it or leave-it transaction. It was one that involved the manufacture and installation of an

8. Fivey v. Panama R. R., 67 N.J.L. 627, 52 A. 472, 473 (Court of Errors and Appeals 1902).

9. Moreira Constr. Co. v. Moretrench Corp., 97 N.J.Super. 391, 235 A.2d 211, 213 (App.Div. 1967), aff'd, 51 N.J. 405, 241 A.2d 236 (1968).

10. Carbone v. Cortlandt, 58 N.J. 366, 277 A. 2d 542, 543 (1971); see Mayfair Fabrics v. Henley, 48 N.J. 483, 226 A.2d 602, 605, 606 (1967). This is not a case involving a blanket disclaimer of liability, as was *Carbone*, relied upon by plaintiff. In this case the parties specifically addressed themselves to the type of damages for which defendant would and would not be liable, and PSE&G secured an insurance policy to cover the very losses involved in this suit.

11. 12A N.J.S.A. § 2–302(1).

12. 12A N.J.S.A. § 2–719(3).

item at a price in excess of $10,000,000, with many details that were to be hammered out by knowledgeable parties. It involved two industrial giants of the nation, and the terms of the agreement were the subject of extensive negotiations over a three-year period. To suggest that PSE&G's representatives failed to read the documents which constitute the parties' agreement charges them with dereliction of duty or incompetence. It should be pointed out that on page 2, Price List 1252, there appeared in bold print headings of "WARRANTY" and "LIMITATION OF LIABILITY."

There is no showing that these giant industrial organizations were of unequal bargaining power. The fact that there were only two companies in the United States that manufactured the generators does not carry the day for the plaintiff. It has already been noted that the agreement of the parties was consummated only after bargaining over a three-year period. There is no claim that PSE&G, an experienced public utility of vast economic power, attempted to alter the limitation of liability provisions or seek more favorable terms from defendant's United States competitors or its foreign competitors. There is no evidence to support a claim that Westinghouse dictated the terms of the contract to an unwilling purchaser who was forced to yield thereto. In sum, there is a complete absence of showing that PSE&G was in a disadvantageous position, in any respect comparable to those of consumers who have been overreached so that the courts were called upon to void the contractual disclaimers as unconscionable.[13]

Equally without substance is plaintiff's related contention that PSE&G, a public utility, "is imbued with a definite public need" and that enforcement of the exculpatory provisions would result in rate increases. This tender concern for the public interest is somewhat farfetched. The fact is that PSE&G, aware of the defendant's limitation of liability, paid a premium for insurance to plaintiff to protect itself and presumably its customers against losses such as occurred here. That premium entered into PSE&G's rate structure. In fact, PSE&G has been reimbursed under the insurance contract for the consequential damages which plaintiff here seeks to recover. The short of it is that this suit involves a private controversy between defendant Westinghouse and plaintiff insurance company, which seeks reimbursement for what is was obligated to and did pay to its assured. Enforcement of the exculpatory clause against plaintiff would in no respect injure PSE&G or its consumers.

The defendant's motion for summary judgment is granted.

13. *E. g.*, Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960); *see* World Prods., Inc. v. Central Freight Service, Inc., 222 F.Supp. 849, 853 (D.N.J.1963), modified on other grounds, 342 F.2d 290 (3d Cir. 1965); Moreira Constr. Co. v. Moretrench Corp., 97 N.J.Super. 391, 235 A.2d 211, 213–214 (App.Div.1967), aff'd, 51 N.J. 405, 241 A.2d 236 (1936).