**ICI AUSTRALIA LIMITED, Plaintiff,**

**v.**

**ELLIOTT OVERSEAS CO., et al., Defendants.**

**Civ. A. No. 81–270.**

United States District Court, D. New Jersey.

Oct. 28, 1982.

Archer, Greiner & Read, P.C., Haddonfield, N.J., Drinker, Biddle & Reath by Patrick T. Ryan, James C. Ingram, Philadelphia, Pa., for plaintiff.

Budd, Larner, Kent, Gross, Picillo & Rosenbaum, P.C. by Samuel A. Larner, Gordon L. Kent, Newark, N.J., for defendant Elliott.

Morgan, Melhuish, Monaghan & Spielvogel by Richard E. Arvidson, Livingston, N.J., for defendant Midland-Ross.

## OPINION

CLARKSON S. FISHER, Chief Judge.

This is an action brought by ICI Australia Limited (ICI) to recover losses resulting from the alleged failure of a Waldron 2HSM coupling in the plaintiff's plant on January 30, 1979. Defendant Elliott Overseas Co. (Elliott), which supplied ICI with the allegedly defective part, has moved for summary judgment on the grounds that (1) plaintiff's claim is barred by the applicable statute of limitations; and (2) plaintiff's claim for consequential damages is barred

by a disclaimer in the contract between ICI and Elliott.

ICI is a company engaged in the manufacture of ethylene, a gaseous hydrocarbon used in the manufacture of plastics, vinyl and the like. On November 17, 1972, defendant Elliott responded to ICI's inquiry by submitting a proposal for the up-rating of the "feedgas train,"[1] a crucial assemblage of equipment at plaintiff's plant. Plaintiff did not accept these proposals but entered into discussions with Elliott which culminated in an oral agreement on January 25, 1973. This agreement was formalized in a written document the following day, which was in turn amended by three subsequent written revisions between January 25 and June 12, 1973.

The allegedly defective coupling which brought about this controversy was first mentioned in the June 12 amendment and was manufactured not by Elliott but by the co-defendant in this action, Midland-Ross Corporation, which shipped the parts directly to ICI in October 1973 and March 1974.[2] The first coupling was installed in November 1973.

In November 1978 this first coupling was replaced under the supervision of an Elliott service engineer by the spare coupling (manufactured to Elliott's specifications) which had arrived at ICI's plant in March 1974. On January 29, 1978, this coupling, located between the gear and high-pressure compressor of the feedgas train, failed, causing extensive damage to the train's other components. Due to necessary repairs, the machine and plant remained out of service until February 14, 1978.

ICI brought an action on January 28, 1981, against Elliott based upon the tort theories of strict liability and negligence, and upon express and implied warranties in its contract with Elliott. New Jersey law provides different time limitations for actions based upon contract concepts from

---

1. The feedgas train is a "string" or "train" of rotating equipment whose components are connected by shafts and couplings and driven by a single power source.

2. Because of a strike, the co-defendant was unable to manufacture a coupling to Elliott's specifications by the required delivery date. ICI consented to waive the specifications for the first 2HSM coupling.

those brought upon tort theories.[3]  N.J.S.A. 12A:2–725(1) provides that "[a]n action for breach of any contract for sale must be commenced within four years after the cause of action has accrued" and that *accrual* takes place "when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach."  On the other hand, an action based on strict liability or negligence is governed by New Jersey's general statute of limitations, N.J.S.A. 2A:14–1.  This statute gives a six-year limitations period which does not begin to run until the plaintiff discovers his injury.

Elliott asserts that in a situation such as that presented in the instant case, the plaintiff is limited to suing on the contract, and that the only applicable statute of limitations is thus provided by N.J.S.A. 12A:2–725.  Under this limitations period the plaintiff's claim is barred, as tender of delivery of the allegedly defective coupling was made in March 1974, considerably more than the established four years before ICI brought this action.  The issue thus comes down to two primary questions: (1) under New Jersey law, may a commercial purchaser bring an action grounded in strict liability in tort; and (2) does ICI have a viable claim for relief based on Elliott's alleged negligence in design and selection of components?

The concept of strict liability in tort emerged in New Jersey in the case of *Henningsen v. Bloomfield Motors,* 32 N.J. 358, 161 A.2d 69 (1960).  The major significance of this case at that time, and at the present, is that it imposed liability upon the maker or seller of a defective product despite its lack of negligence or knowledge of the product's defect.  This concept was subsequently codified in section 402 of the Restatement of Torts, Second.

It is Elliott's contention that the doctrine of strict liability does not apply to commercial transactions, as commercial purchasers are in a relatively equal bargaining position with the seller and are supposedly not in

need of the consumer protections which provided one of the reasons for the adoption of strict liability.  This rationale has been adopted by the Fourth Circuit in *Purvis v. Consolidated Energy Products Co.,* 674 F.2d 217 (4th Cir.1982), and by the Illinois Supreme Court in *Moorman Mfg. Co. v. National Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982), based upon the decision in *Kaiser Steel Corp. v. Westinghouse Electric Corp.,* 55 Cal.App.3d 737, 127 Cal. Rptr. 838 (1976).  These courts have viewed equality of bargaining power as the key factor in determining whether a strict-liability action is available, and would most likely find ICI's financial resources and negotiating ability to ban recovery on a strict-liability theory in this case.

As the defendant acknowledges, however, in this instance it is necessary to determine and apply the policy of the New Jersey courts in this regard.  Elliott cites the case of *Heavner v. Uniroyal,* 63 N.J. 130, 305 A.2d 412 (1973), to support the proposition that the Uniform Commercial Code (UCC) provisions codified as part of New Jersey law provide the sole remedy for a plaintiff such as ICI.  In particular, the defendant emphasizes the *Heavner* court's assertion that N.J.S.A. 12A:2–725 does *not* apply to personal injury claims, and that court's mention of a "personal injury-property damage dichotomy."  63 N.J. at 146, 305 A.2d 412.  Elliott contends that the *Heavner* court intended to also establish the converse of this proposition as law—that is, that the N.J.S.A. 12A:2–725 limitations period *must* apply to all pure property damage actions.

A close reading of *Heavner* does not support Elliott's interpretation of this case.  In fact, the court explicitly stated that "[w]e do not reach the question of whether N.J. S.A. 12A:2–725 applies ... in the commercial sense."  63 N.J. at 157 n. 16, 305 A.2d 412.  It is thus necessary to examine the rationale behind other critical New Jersey strict-liability decisions to determine wheth-

---

**3.**  Both ICI and Elliott agree that New Jersey law should be applied in determining the ap-

propriate limitations period.

er that theory may be employed by the plaintiff in this case.

■ The single case which best demonstrates the general approach taken by New Jersey's highest court in this area is *Santor v. A & M Karagheusian*, 44 N.J. 52, 207 A.2d 305 (1965). In that case the New Jersey Supreme Court adopted the principle that a strict-liability claim is available in a case involving only economic loss as opposed to personal injury. The court found that "although the doctrine has been applied principally in connection with personal injuries sustained by expected users from products which are dangerous when defective, . . . the responsibility of the maker should be no different where damage to the article sold or to other property of the consumer is involved." *Santor*, 44 N.J. at 66, 207 A.2d 305. Although this is clearly a minority view among the states, it remains the law in New Jersey to this day.

■ The only New Jersey case to directly address the issue of whether strict liability can be applied to a commercial claimant is *Monsanto v. Alden Leeds*, 130 N.J.Super. 245, 326 A.2d 90 (Law Div.1970). The *Monsanto* decision came down on the side of such an application, determining that "[i]njuries to a man's business can be as detrimental to our society as injuries to his person." 130 N.J.Super. at 259, 326 A.2d 90. Combined with the New Jersey Supreme Court's *Santor* holding, *Monsanto* provides a strong indication that strict-liability actions are available to commercial purchasers in New Jersey. It is clear that under the policy of the New Jersey courts the maker or manufacturer of a defective and unreasonably dangerous product is to bear the cost of an injury caused by that product, regardless of whether the injury is personal or economic, or whether the purchaser is a private individual or a corporation. Thus, decisions from other jurisdictions, such as *Plainwell Paper Co. v. Pram*, 430 F.Supp. 1386 (W.D.Pa.1977), and *Royal Indemnity Co. v. Westinghouse Electric Corp.*, 385 F.Supp. 520 (S.D.N.Y.1974), which stress the "economic loss" aspect of the case in declining to find strict liability are inapposite in these circumstances.

■ The primary consideration, then, in determining if strict liability is available to ICI is whether the alleged defect in the Waldron coupling rendered it "unreasonably dangerous." In this instance "the nature of the defect and the type of risk it poses are the guiding factors." *Pennsylvania Glass Sand v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1174 (3d Cir.1981). The plaintiff has produced sufficient evidence from affidavits and depositions of Elliott employees to demonstrate that the damage to its property was of a sudden and severe nature. Indeed, the head of Elliott's mechanical design department, after participating in an investigation of the accident, referred to it as a "catastrophic failure." (Deposition Exhibit P 52 at 4). Although no individual was physically injured as a result of the coupling's failure, the risk and damage which did occur are in and of themselves enough to give rise to a strict-liability claim in New Jersey.

ICI alleges negligence on Elliott's part in designing and selecting the coupling which was eventually installed in its feedgas train. Elliott does not assert that a negligence claim may not arise out of the same circumstances which give birth to contract action(s), and there is no authority for this proposition. This situation is analogous to that in *Triangle Underwriters v. Honeywell*, 604 F.2d 737 (2d Cir.1979). In that case, differing statutes of limitations were applied in assessing the viability of the plaintiff's contract and tort claims, respectively, with both claims arising from the identical set of facts. The same result should apply here.

■ In the instant case, Elliott has failed to show that the UCC provides the sole remedy for plaintiffs such as ICI in this set of circumstances. Thus, the limitations period for such actions (consisting of four years from the date of delivery of the defective product) does not operate to bar all of plaintiff's claims. Instead, the New Jersey general statute of limitations must be applied to ICI's strict-liability and negli-

gence claims. Under that statute a cause of action accrues when a party discovers or should discover the injuries caused by an alleged defect. *Rosenau v. City of New Brunswick,* 51 N.J. 130, 137, 238 A.2d 169 (1962). In this case the plaintiff initiated its action within the mandated period and a grant of summary judgment for defendant Elliott is thus not warranted.

Elliott's revision # 1 of its original proposal to the plaintiff, dated November 26, 1978, contains "Terms and Conditions" on the back side of the quotation which purport to disclaim liability for consequential damages of any kind. Elliott contends that this provision is a part of the contract between the parties and prevents ICI's recovery here. ICI counters that the January 26 writing was a confirmation of the parties' January 25 oral agreement, and that the disclaimer provision constitutes "additional terms" which "materially alter" said agreement and thus did not become a part of the contract under section 2–207 of the UCC.

The Third Circuit and other courts have ruled that a clause such as the one in question limiting liability for damage to property is acceptable in contracts between business concerns. *See Chatlos v. National Cash Register Corp.,* 635 F.2d 1081 (3d Cir. 1980); *Keystone Aeronautics Corp. v. R.J. Enstrom Corp.,* 499 F.2d 146 (2d Cir.1974). Such disclaimers have been held valid whether limiting liability for tortious injury, contract damages, or both. *Gates Rubber Co. v. USM Corp.,* 508 F.2d 603 (7th Cir.1975); *Royal Indemnity Co. v. Westinghouse Electric Corp.,* 385 F.Supp. 520 (S.D. N.Y.1974). Therefore, in the instant case the court is concerned not with the validity of Elliott's disclaimer, but with the question of whether it ever became part of the final agreement between Elliott and ICI.

Although Elliott's "Terms and Conditions" were contained in its November 1972 proposal, there is no clear proof that they remained a part of the oral agreement reached with ICI on January 25, 1972. In fact, the parties did not even discuss these provisions in the negotiations which led to the conclusion of this agreement. (Deposi-

tion of E.O. Mairer [Elliott's Western Service Manager] at 37, 50–51; Deposition of R. Stewart [Elliott's Western Engineering Manager] ). Under these circumstances, it cannot be assumed that a disclaimer of all consequential damages was "impliedly" included in the January 25 agreement. The disclaimer in the January 26 confirmation did then constitute an alteration of the parties' oral agreement.

Under section 2–207(2)(b) of the UCC additional proposed terms which materially alter a contract do not become part of that contract. The courts have generally held that whether a particular clause materially alters an agreement is a question of fact to be resolved at trial, and not a matter suitable for summary judgment. *See N & D Fashions, Inc. v. DHJ Industries, Inc.,* 548 F.2d 722, 726 (8th Cir.1977); *Leonard Pevar Co. v. Evans Products Co.,* 524 F.Supp. 546 (D.Del.1981); *Ebasco Services, Inc. v. Pennsylvania Power & Light Co.,* 402 F.Supp. 421 (E.D.Pa.1975). Given these decisions and the factual situation of this case, it is impossible to conclude at this point that Elliott's disclaimer clause was or was not a material alteration of its agreement with ICI. This is an issue more appropriately left for decision at trial. Summary judgment is denied. Plaintiff will submit an order within 10 days. No costs.