780 F.2d 1093
 54 USLW 2387, 1 UCC Rep.Serv.2d 415
 CONSUMERS POWER COMPANY
v.
CURTISS-WRIGHT CORPORATION.
Appeal of CURTISS-WRIGHT CORPORATION, Appellant in Nos.
84-5728 and 85-5027.
Appeal of CONSUMERS POWER COMPANY, Appellant in Nos. 84-5764
and 85-5047.
 Nos. 84-5728, 84-5764, 85-5027 and 85-5047.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 5, 1985.
Decided Jan. 13, 1986.
 
 Samuel A. DeGonge (argued), DeGonge, Garrity & Fitzpatrick, P.A., Bloomfield, N.J. for appellant.
 R. Peter Connell (argued), Guy F. Clerici, Campbell, Foley, Lee, Murphy & Cerniglia, Asbury Park, N.J., for appellee.
 Before SEITZ, WEIS, and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 In this appeal from a jury verdict in a diversity action,[1] we are presented with the important question whether a commercial party, such as the plaintiff utility, may recover under the law of New Jersey in strict liability for accidental damages to a defectively repaired engine. Consumers Power Company (Consumers Power), a Michigan public utility, sued in the United States District Court for the District of New Jersey and recovered a verdict against the Curtiss-Wright Corporation (Curtiss-Wright) for damages resulting from its defective repair of a gas turbine owned by the utility. Curtiss-Wright appeals from the judgment entered on the verdict after a reduction in the form of a remittitur, contending, inter alia, that such damages constitute economic loss which may not be recovered under tort principles under New Jersey law. Consumers Power cross-appeals, asserting that because both parties had accepted the remittitur, Curtiss-Wright's appeal from the judgment entered on the reduced verdict frustrates the purpose of the district court's remittitur and that the original jury verdict should therefore be reinstated. We see no merit in either appeal[2] and affirm.
 
 I.
 
 2
 Consumers Power, a Michigan public utility, uses converted aircraft engines to generate power. In 1975, the high compressor in one of Consumers Power's engines failed. Consumers Power sent the engine to Curtiss-Wright's New Jersey facility with instructions for it to repair the high compressor and to disassemble and overhaul the low compressor. In the course of the repairs, Curtiss-Wright inadvertently switched the low compressor with the same part from another engine. The parts were interchangeable and the parties have stipulated that rotating interchangeable parts was a common industry practice recognized by both parties. The repairs were completed and the engine returned to Consumers Power in late 1975.
 
 
 3
 Before reassembling the engine, Anthony Spadaro, an inspector for Curtiss-Wright, examined the compressor disc of the low compressor with the aid of a magnifying glass, and found it to be in good condition. He found no evidence of wear or corrosion and therefore assumed that it was sufficiently coated with cadmium, a malleable metallic element used to prevent stress and cracking. Irving Glater, who had performed failure analyses of this model engine for its manufacturer, Pratt & Whitney, before becoming an independent consultant, testified as an expert witness for Consumers Power. According to Glater, the manufacturer had in 1974 instructed its authorized repair shops--including the Curtiss-Wright facility--that compressor discs were to be coated with between .5 and .7 mils of cadmium to prevent the discs from cracking. Previously, the standard instruction provided for .3 to .5 mils of cadmium coating. Glater also testified that the required cadmium coating on the surface of the disc would leave some coating in the pinhole at the center of the disc. Nicholas Brennan, a senior marketing specialist for Curtiss-Wright, testified on its behalf; he agreed that a used disc should be placed in an engine only if it has the required cadmium coating. Pratt & Whitney did not require that discs be replated with cadmium or be inspected in any particular way each time an engine was overhauled.
 
 
 4
 In 1978 Consumers Power noted that the repaired engine was vibrating and sent it to a facility in Texas for repair. The engine exploded while being tested in Texas, reducing its market value from at most $525,000 to at least $170,000. A crack in the lower compressor disc that had been inspected by Curtiss-Wright but not recoated with cadmium before its reassembly and return in 1975 caused the explosion. In Glater's opinion, the crack might have been prevented if the disc had been recoated with the proper amount of cadmium at the time of the repair. Glater had found when he inspected the disc's coating in 1983 that there was insufficient cadmium--between .3 and .4 mils--although he could not say how thick the coating was at the spot where the disc cracked, or how much coating might have evaporated in the time between the 1975 Curtiss-Wright repair and the 1978 accident, or in the time between the accident and his inspection in 1983.
 
 
 5
 A witness for Curtiss-Wright testified that Consumers Power probably received a brochure which stated under its guarantee provisions that Curtiss-Wright limited its liability to accidents occurring within fifteen months of repairs. The engine exploded more than two years after Curtiss-Wright's repairs.
 
 
 6
 The jury found that Curtiss-Wright was liable on a strict product liability count, and seventy percent liable on a comparative negligence count. The trial court addressed several post-verdict motions of the parties. The court found there was sufficient evidence to support the jury's verdict, and denied Curtiss-Wright's motion for a new trial. It also rejected Curtiss-Wright's motion for a directed verdict based on the contention that its sales brochure contained a contractual provision limiting its liability.
 
 
 7
 The court concluded, however, that the jury misunderstood the court's instructions on damages. The jury had been instructed to limit damages to the cost of repairs, if the cost of repairs was less than the difference in market value of the engine before and after the explosion. The jury found damages of $469,098.17, the highest estimate of the cost of repairing the engine after the explosion. The court granted a remittitur to adjust damages to $355,000, the difference between the market value of the engine before and after the accident, which it held to be the maximum damages awardable. Both parties accepted the remittitur. When Curtiss-Wright filed this appeal, Consumers Power moved to have the district court reinstate the original damages, but the court denied the motion, finding that the jury award was larger than permitted by the facts or law.
 
 
 8
 On appeal, Curtiss-Wright asserts that the district court erred in not finding that a contractual term in its sales brochure limited Curtiss-Wright's liability and mandated a directed verdict, and in denying its motion for a new trial on the ground that the evidence was insufficient to show that the accident resulted from Curtiss-Wright's failure to recoat the compressor disc with cadmium. Curtiss-Wright also asserts that under Spring Motors Distributors, Inc. v. Ford Motor Co., 98 N.J. 555, 489 A.2d 660 (1985), announced after the district court's judgment in this case, Consumers Power cannot recover in strict product liability.
 
 II.
 A.
 
 9
 Curtiss-Wright argues that its motion for a directed verdict should have been granted because a provision in a sales brochure it routinely sent to customers effectively created a contractual term that limits its liability. At trial, Curtiss-Wright could not produce a copy of the sales brochure in use in 1975 when Consumers Power sent the engine to Curtiss-Wright for repairs. It submitted a 1976 version of the brochure, the substance of which it claimed was in effect in 1975 and had been sent to Consumers Power. The brochure provided under the heading "GUARANTEES" that its repairs would be "free from defective workmanship." The guarantee is limited to fifteen months after Curtiss-Wright completes the repairs, and is to be the sole basis for Curtiss-Wright's liability "in tort, contract, or otherwise."
 
 
 10
 The guarantee appears in three paragraphs as the sixth of ten numbered items of "General Terms and Conditions," at the end of a fifty-five page brochure on gas turbine repair services. The first numbered item states the hourly repair rate, and Brennan testified for Curtiss-Wright that Consumers Power would not deal with Curtiss-Wright without being told the hourly rate. The terms and conditions were not discussed, Brennan said. "The only agreement was that we would do specifically what the customer requested and nothing else." No one from Consumers Power was asked about the brochure at trial, and in a pre-trial deposition Rolf Sorenson, a senior engineer for Consumers Power, stated that he did not know when, if at all, he would have received the brochure.
 
 
 11
 The district court, in denying Curtiss-Wright's motion for a directed verdict, found that there was insufficient evidence to show that Consumers Power "was ever aware of, let alone negotiated and consented to, the limitation of liability." This court in reviewing a denial of a directed verdict views the evidence in a light most favorable to the non-moving party. Dawson v. Chrysler Corp., 630 F.2d 950, 959 (3d Cir.1980), cert. denied, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981). If conflicting or contradictory evidence is presented that could lead to inconsistent conclusions, a directed verdict is not justified. Fireman's Fund Ins. Co. v. Videfreeze Co., 540 F.2d 1171, 1178 (3d Cir.1976), cert. denied, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977).
 
 
 12
 Contractual limitations on liability for negligence are frowned upon and will not be enforced unless they are bargained for. Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 396-97, 161 A.2d 69 (1960). Such limitations in contracts are read strictly, "with every doubt resolved against the party seeking their protection." Neville Chem. Co. v. Union Carbide Corp., 422 F.2d 1205, 1216-17 (3d Cir.), cert. denied, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970) (applying Pennsylvania law which is similar to New Jersey law). See Rubin v. AMC Home Inspection & Warranty Service, 175 N.J.Super. 315, 418 A.2d 306, 309 (Super.Ct.Law Div.1980). Liability limitations upheld by the courts have usually been the subject of extensive negotiations between the parties. See e.g., Royal Indemnity Co. v. Westinghouse Elec. Corp., 385 F.Supp. 520, 525 (S.D.N.Y.1974) (construing New Jersey law) (contract entered into after three years of arms-length negotiations). Cf. 12A N.J.Stat.Ann. 2-719(1)(b) (1962) (under the U.C.C., remedies are not exclusive unless "expressly agreed to").
 
 
 13
 The liability limitation Curtiss-Wright seeks to enforce was not the subject of negotiation. There is no evidence that Consumers Power ever received the brochure, much less that it read and consented to its contents. New Jersey law requires an unambiguous agreement to a limitation of remedies between commercial parties in the sale of a product. See Spring Motors, 489 A.2d at 668 (1985) ("[commercial] parties should be free to make contracts of their choice, including contracts disclaiming liability for breach of warranty. Once they reach such an agreement, society has an interest in seeing that the agreement is fulfilled.") (emphasis added); Chatlos Systems v. National Cash Register Corp., 635 F.2d 1081, 1087 (3d Cir.1980) (direct and simply stated limitations clause in a signed contract between businessmen will be enforced). Consumers Power may not have relied on the brochure to learn the hourly repair rate; it might have learned the rate in a telephone conversation with Curtiss-Wright, or assumed the rate was in keeping with industry standards. The evidence shows only that Curtiss-Wright agreed to repair the engine, and Consumers Power agreed to pay for the repair. There is an absence of evidence to support an agreement between the parties to limit the remedies available to Consumers Power.
 
 
 14
 We perceive no error in the district court's holding that the evidence concerning the liability limitations clause as a part of the repair contract between Curtiss-Wright and Consumers Power is "contradictory and inconclusive" and that the motion for a directed verdict must therefore be rejected.
 
 B.
 
 15
 The district court denied Curtiss-Wright's motion for a new trial under Fed.R.Civ.P. 59(a), finding that Consumers Power's expert testimony and the uncontested facts regarding the explosion provided "sufficient factual basis for a finding of liability on the strict liability claim."
 
 
 16
 Curtiss-Wright argues that the jury's verdict rests on legally insufficient evidence because Consumers Power's expert, Glater, could not state definitively how much cadmium was in the pinhole of the disc when it left Curtiss-Wright's hands in 1975, and because according to his testimony no particular quantity of cadmium was required by Pratt & Whitney in pinholes. Curtiss-Wright's argument comes down to an assertion that the testimony of Spadaro, the Curtiss-Wright inspector who stated that the disc was in good condition, should have received greater consideration by the jury than Glater's testimony, because the inspector actually saw the disc in 1975 and Glater did not.
 
 
 17
 Decisions to grant a new trial rest in the sound discretion of the district court, which should set aside a jury's verdict only if manifest injustice will otherwise result. Raynor Bros. v. American Cyanimid Co., 695 F.2d 382, 385 (9th Cir.1984); Lanza v. Poretti, 537 F.Supp. 777, 782 (E.D.Pa.1982). This court will reverse the district court's new trial decision only when the district court failed to use or abused its discretion. Christmas v. Sanders, 759 F.2d 1284, 1289 (7th Cir.1985); Thomas v. E.J. Korvette, 476 F.2d 471, 474-75 (3d Cir.1973).
 
 
 18
 A dispute over credibility will not justify a new trial. Rios v. Empresas Lineas Maritimas Argentinas, 575 F.2d 986, 990 (1st Cir.1978); see Lewin v. Metropolitian Life Ins. Co., 394 F.2d 608, 614-15 (3d Cir.1968). Glater's testimony, if believed by the jury, would indicate that the visual inspection of the disc by Curtiss-Wright in 1975 was an inadequate means of evaluating wear of the cadmium--the cadmium coating should have been measured. The limitations Glater conceded in analyzing the disc years after the accident go to the weight the jury would give this testimony. Glater's testimony about the pinhole's cadmium, in context, indicates that there is no way to measure the pinhole's coating directly, but that his spot surface measurements of the exterior and interior of the disc supports his view that there was an inadequate amount of cadmium in the pinhole. The conceded uncertainties in his methods go once again only to the weight the jury might choose to give Glater's testimony.
 
 
 19
 We see no abuse in the district court's exercise of its discretion to deny Curtiss-Wright's motion for a new trial.
 
 III.
 
 20
 The New Jersey Supreme Court recently held in Spring Motors that a commercial buyer seeking recovery from the seller for repairs to a defective product as well as for lost profits resulting from the purchase has its sole remedy in warranty under the U.C.C., and cannot recover in strict liability or negligence. 489 A.2d at 663. In this case, Curtiss-Wright argues on appeal that having abandoned its claim during trial for breach of warranty under the Uniform Commercial Code (UCC), Consumers Power is precluded from any recovery on a strict liability theory under the rule enunciated in Spring Motors.[3] We disagree.
 
 
 21
 In Spring Motors, the issue before the court was the appropriate statute of limitations--four years for a claim under the UCC and six years for negligence and strict liability claims. Economic losses were patently involved and the seller, unlike the situation here, had clearly and specifically invoked limitations of liability by warranty. The court held that "a commercial buyer seeking damages for economic loss only should proceed under the UCC against parties in the chain of distribution." Id. at 672.
 
 
 22
 The Spring Motors court did not refer to property damage of the sort suffered here as economic loss. The court there explained that economic loss means such things as "loss of the benefit of the bargain" and "lost profits." 489 A.2d at 665. Here, the judgment awarded is for property damages to the engine only. Commercial plaintiffs can recover in strict liability or negligence for accidental property damage, as the court explicitly stated. Distinguishing Monsanto Co. v. Alden Leeds, Inc., 130 N.J.Super. 245, 326 A.2d 90 (Super.Ct.Law Div.1974), relied on by the plaintiff in Spring Motors, the court stated:
 
 
 23
 Monsanto is distinguishable because it involved property damage, which is recoverable under strict liability. The case of ICI Australia Ltd. v. Elliott Overseas Co., 551 F.Supp. 265 (D.N.J.1982), on which plaintiff likewise relies, also involved negligence and strict liability claims by a commercial buyer against an immediate seller for property damage caused by an accident.
 
 
 24
 489 A.2d at 672. Accidental property damage is precisely what we have in this case and it does not become mere economic loss when the damage is limited to the defective product itself.[4]
 
 
 25
 In Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co., 652 F.2d 1165 (3d Cir.1981), which is discussed approvingly in Spring Motors, this court explained the difference between economic loss and property damage:
 
 
 26
 [T]he courts of most states ... have classified the damages consequent to qualitative defects, such as reduced value, return of purchase price, repair and replacement, or lost profits, as economic loss, and have relegated those who suffer such commercial loss to the remedies of contract law....
 
 
 27
 On the other hand, almost all courts have adopted the view that the benefit-of-the-bargain approach of warranty law is ill-suited to correct problems of hazardous products that cause physical injury....
 
 
 28
 In cases such as the present one where only the defective product is damaged, the majority approach is to identify whether a particular injury amounts to economic loss or physical damage.... [T]he line between tort and contract must be drawn analyzing interrelated factors such as the nature of the defect, the type of risk, and the manner in which the injury arose.
 
 
 29
 652 F.2d at 1172-73 (footnotes omitted). In Pennsylvania Glass, this court held that under Pennsylvania law, following the majority rule, a commercial party may recover tort damages in strict liability for sudden and calamitous damage to a product caused by its defective condition. 652 F.2d at 1175.[5]
 
 
 30
 It is pure fortuity that the explosion that reduced Consumers Power's engine to scrap did not damage any person or property nearby. The defective compressor disc did not lead merely to a loss of efficiency or a decline of profits; the disc's failure caused a sudden, violent and calamitous accident which posed a serious threat to persons and property. The damage caused by the explosion is property damage, not economic loss. Cf. Henry Heide, Inc. v. WRH Products Co., Inc., 766 F.2d 105 (3d Cir.1985) (following Spring Motors, commercial party may not recover in strict liability or tort for economic loss caused by gradual warping of plastic trays).[6]
 
 
 31
 There is a second ground for distinguishing this case from Spring Motors. The Spring Motors court was concerned that, if a commercial party could recover in strict liability for economic loss, it would obtain a greater economic benefit than it had contractually bargained for. 489 A.2d at 671. In the present case, as discussed above, the district court justifiably found that no limitation of liability had been agreed to by the parties. They did not shift the economic risk of an accident by agreement from what the parties could expect under ordinary tort principles.
 
 
 32
 Accordingly, we do not believe Spring Motors precludes commercial parties from recovering for property damage to defective products in strict liability actions.
 
 IV.
 
 33
 Consumers Power contends that the court's remittitur of the jury verdict was intended to be a compromise between the parties. It argues that Curtiss-Wright has defeated the district court's purpose by filing this appeal and this justifies the reinstatement of the original jury verdict. The district court denied a motion to reinstate the jury verdict on this ground, holding that the remittitur was necessary as a matter of law because the jury had used the wrong measure of damages. The court in reaching its decision considered the same authority that Consumers Power presents on appeal.
 
 
 34
 The court and the parties apparently proceeded on the misapprehension that a question regarding the right to appeal from a remittitur in a diversity action is governed by state law. The Supreme Court has stated the contrary, that "[t]he proper role of the trial and appellate courts in the federal system in reviewing the size of jury verdicts is ... a matter of federal law ... and a plaintiff in federal court, whether prosecuting a state or federal cause of action, may not appeal from a remittitur order he has accepted." Donovan v. Penn Shipping Co., Inc., 429 U.S. 648, 649-50, 97 S.Ct. 835, 836-837, 51 L.Ed.2d 112 (1977) (per curiam). See, e.g., Kazan v. Wolinski, 721 F.2d 911, 913 (3d Cir.1983). Following Donovan, a plaintiff in a diversity action may not appeal from an accepted remittitur, even when, as in this case, the defendant has appealed on other grounds. Westerman v. Sears, Roebuck & Co., 577 F.2d 873, 883 (5th Cir.1978). See generally 6A Moore's Federal Practice p 59.08 at 59-204 to 59-208 (2d ed.1985).
 
 
 35
 We are therefore not required to review the New Jersey law of remittitur discussed by the district court. As a matter of federal law, Consumers Power may not appeal from a remittitur it has accepted.
 
 V.
 
 36
 We hold that New Jersey law does not prevent a commercial party from recovering property damages in tort for accidental injury to a defective product, and we see no merit in the other issues raised on appeal. Accordingly, the judgment of the district court will be affirmed.
 
 
 37
 WEIS, Circuit Judge, dissenting.
 
 
 38
 New Jersey was an early advocate of increased protection for the consumer in the products liability field. In the seminal case Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960), the state supreme court permitted recovery under an implied warranty theory for personal injuries and damage to an automobile that had crashed as a result of a defect. That case led ultimately to the adoption of Sec. 402A of the Restatement (Second) of Torts.
 
 
 39
 The doctrine of strict liability in tort was carried to its extremes in Santor v. A & M Karagheusian, Inc., 44 N.J. 52, 207 A.2d 305 (1965), allowing recovery for the inferior quality of a rug that the defendant had manufactured and sold through a distributor to the plaintiff. The defect had caused no personal injury or extraneous property damage, and the plaintiff's recovery was solely for loss of the product's value.
 
 
 40
 Other courts did not follow New Jersey to this length; instead most turned to Seely v. White Motor Co., 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965). There, the California Supreme Court held that the purchaser of a defective truck, who sought to recover from the manufacturer for loss of profits and the price of the truck, was required to seek his remedy in sales law rather than tort.
 
 
 41
 New Jersey maintained its expansive view of liability in product defect cases until it carefully examined the conflict between the Uniform Commercial Code and tort liability in Spring Motors Distrib., Inc. v. Ford Motor Co., 98 N.J. 555, 489 A.2d 660 (1985). In a major policy statement, the court said, "[t]he considerations that give rise to strict liability do not obtain between commercial parties with comparable bargaining power." Id. at 576, 489 A.2d at 670.
 
 
 42
 That modified approach pays heed to the comprehensive statutory scheme embodied in the Uniform Commercial Code, a legislative enactment that satisfies the needs of the world of commerce. The New Jersey court concluded that the Uniform Commercial Code " 'is generally regarded as the exclusive source for ascertaining when a seller is subject to liability for damages if the claim is based on intangible economic loss not attributable to physical injury to person or harm to a tangible thing other than the defective product itself.' " Id. at 581, 489 A.2d at 673, quoting W. Prosser & W. Page Keeton, Handbook of the Law of Torts, Sec. 95A at 680 (5th ed. 1984). To rephrase the proposition, only when the loss is attributable to bodily injury or damage to property other than the defective product itself, is the remedy in tort.
 
 
 43
 I have little doubt that, under New Jersey law, the plaintiff's claim here is cognizable under the Commercial Code. The Code Sec. 102(1) provides that the it "shall be liberally construed and applied to promote its underlying purposes and policies." N.J.Stat.Ann. 12A:1-102 (West 1976). See also, Note, Contracts for Goods and Services and Article 2 of the Uniform Commercial Code, 9 Rutg.-Cam.L.J. L.J. 303 (1978).
 
 
 44
 In Newmark v. Gimbel's, Inc., 54 N.J. 585, 258 A.2d 697 (1969), the plaintiff was injured by a permanent wave solution applied in a beauty parlor. The trial court dismissed the warranty count, characterizing the transaction as one for services and not for goods. The Supreme Court of New Jersey reversed, finding that the U.C.C. applied and that warranties were not limited to "transactions which technically meet [the] definition of a sale.... [T]here is no sound reason for restricting implied warranties of fitness to conventional sales of goods." Id. at 594, 258 A.2d at 701.
 
 
 45
 In the case at hand, part of the transaction included the sale of engine parts. A defect in one of those components, the lower compressor disc, caused the harm, not the manner in which the services were performed. See Worrell v. Barnes, 87 Nev. 204, 484 P.2d 573 (1971); Hawkland, U.C.C. Series, Sec. 2-102:04. The circumstances thus bring the claim within the Code's broad language, "transactions in goods." N.J.Stat.Ann. 12A:2-102 (West 1976).
 
 
 46
 The remaining inquiry is whether the damage to the defective product itself, here the turbine, was within the meaning of "economic loss" as applied in Spring Motors. Although the precise point was not presented in that case, as noted earlier, the New Jersey court did cite favorably from Prosser & Keaton, Sec. 95(a) at 680. It is a fair restatement of that quote that economic loss includes "harm to ... the defective product itself." 98 N.J. at 581, 489 A.2d at 673.
 
 
 47
 The distinction between injury to the defective product and that to other property is discussed at some length in a law review article cited in Spring Motors-- Franklin, When Worlds Collide: Liability Theories and Disclaimers in Defective Product Cases, 19 Stan.L.Rev. 974 (1966). Discussing the language courts have used to describe damages in product liability cases, the author distinguishes harm to property extraneous to the defective article from injury to the product itself. Other commentators have similarly observed that distinction by using the term "physical damage" to refer to property other than the article purchased. The distinction is important in determining the boundary between tort and contract liability. See Note, Economic Loss in Products Liability Jurisprudence, 66 Colum.L.Rev. 917 (1966).
 
 
 48
 In Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp., 626 F.2d 280 (3d Cir.1980), we applied Illinois law in concluding that the cost of repair and eventual replacement of a defective roof in a commercial setting was recoverable under the Uniform Commercial Code--not in tort. We referred to an Illinois decision defining economic loss as " 'damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits without any claim of personal injury or damage to other property.' " 626 F.2d at 284, quoting Alfred N. Koplin & Co. v. Chrysler Corp., 149 Ill.App.3d 194, 199, 7 Ill.Dec. 113, 116, 364 N.E.2d 100, 103 (1977). In that situation, economic loss is most frequently measured by the cost of repairing the infirmity or by the decrease in the product's value. There too it was important that a large company, which is in a position to bargain for terms that meet its needs, expectations and economic interest, could protect itself from unacceptable risks.
 
 
 49
 Discussing economic loss in a commercial setting, Spring Motors distinguished a trial court decision, Monsanto Co. v. Alden Leeds, Inc., 130 N.J.Super. 245, 326 A.2d 90 (Law Div.1974), saying that it involved "property damage and consequential economic loss." 98 N.J. at 578, 489 A.2d at 672. In that case, defective chemicals had caused a fire that damaged the plaintiff's warehouse. By distinguishing Monsanto on that ground, the court in Spring Motors recognized the difference between harm to the defective product and injury to extraneous property.
 
 
 50
 Spring Motors also commented on the situation where potential claims for personal injuries might be present. Since the issue was not squarely presented, the court had no need to meet it. However, it seems inconsistent to limit a commercial plaintiff's recovery for damage to a defective product to contract theories when no other injuries occur, but to allow a tort action when they do.
 
 
 51
 The New Jersey Supreme Court has adopted a fundamental policy that in a commercial setting, economic loss, including damage to the product itself, is a matter for negotiation and allocation of risk between the parties. The fortuity that personal injury or outside property damage might occur in addition to injury to the defective product does not require a different rule with respect to economic loss. To deviate from the basic rule would lead to speculation and inquiry unrelated to the negotiations between the commercial entities. That result would be contrary to the state's policy of encouraging such agreements. In any event, the passing reference in Spring Motors to a case decided in Alaska, Kodiak Electric Ass'n. v. DeLaval Turbine, Inc., 694 P.2d 150 (Alaska 1984), is anything but indicative of the way the New Jersey court would decide that point.
 
 
 52
 I conclude that under New Jersey law the claim in this case for damage to the defective product is governed by contract, not tort. Accordingly, I dissent.
 
 
 
 [1]
 Consumers Power is a Michigan public utility and Curtiss-Wright is a Delaware corporation licensed to do business in New Jersey. The district court had diversity jurisdiction pursuant to 28 U.S.C. Sec. 1332 (1982) and this court has jurisdiction over the final judgment pursuant to 28 U.S.C. Sec. 1291 (1982). It is undisputed that the law of New Jersey governs this suit, which follows upon repair services performed by Curtiss-Wright in New Jersey
 
 
 [2]
 We are without jurisdiction to consider two earlier appeals filed by Curtiss-Wright and Consumers Power, Nos. 84-5728 and 84-5764, because after these appeals were filed, the district court ordered the judgment modified in some respects, and denied other motions for reconsideration. Under Fed.R.App.P. 4(a)(4), which is strictly construed, Griggs v. Consumer Discount Corp., 459 U.S. 56, 61, 103 S.Ct. 400, 403, 74 L.Ed.2d 225 (1982), prematurely filed notices of appeal are nullities in such circumstances
 After the district court's final judgment, Curtiss-Wright filed a timely notice of appeal, No. 85-5027, and Consumers Power filed a timely cross-appeal, No. 85-5047. These are the appeals we review in this opinion.
 
 
 [3]
 Consumers Power's strict product liability claim is predicated on the theory that Curtiss-Wright rebuilt the engine with a defective and inadequately inspected used part from another engine, which failed and caused Consumers Power's engine to explode. New Jersey imposes strict liability on the providers of defective repair and rebuilding services. See Michalko v. Cooke Color & Chem. Co., 91 N.J. 386, 451 A.2d 179, 186 & n. 4 (1982)
 
 
 [4]
 The dissent points out that Monsanto involved accidental damage to property other than the product itself. In ICI Australia, however, accidental damage following the installation of a faulty part did not extend beyond the system repaired. 551 F.Supp. at 266. Similarly, damage from the catastrophic failure of the compressor disc in the present case was limited to the engine. The ICI Australia court allowed recovery in strict liability because, as here, the damage was "of a sudden and severe nature" and rendered the defect unreasonably dangerous. 551 F.Supp. at 268
 
 
 [5]
 Kodiak Electric Ass'n v. DeLaval Turbine, Inc., 694 P.2d 150, 153-54 (Alaska 1984), also discussed approvingly in Spring Motors, 489 A.2d at 672, held that injury to a defective product in an accident that could have injured persons or other property constitutes property damage for which the remedy of strict liability in tort is available. 694 P.2d at 153
 
 
 [6]
 The only language in Spring Motors which appears to support Curtiss-Wright's contention is the statement, quoted by the dissent, that "the U.C.C. 'is generally regarded as the exclusive source for ascertaining when a seller is subject to liability for damages if the claim is based on intangible economic loss not attributable to physical injury to person or harm to a tangible thing other than the defective product itself.' " Spring Motors, 489 A.2d at 673 (emphasis added), quoting W. Prosser & W. Keeton, The Law of Torts (5th ed.1984) Sec. 95A at 680
 We do not believe the quotation of this language is strong enough indication that the New Jersey Supreme Court intended to undermine the distinction between accidental injury constituting property damage and the gradual deterioration that makes out a claim for economic loss. Prosser and Keeton do not support their criticism of this distinction with any case authority, and they note that most courts do allow recovery in strict liability for accidental damage to the defective product. W. Prosser & W. Keeton, Sec. 101 at 709. Nor was the distinction an issue in Spring Motors itself, which was ruling on the recoverability of intangible economic losses--lost profits and lost value caused by the frequent failures of defective truck transmissions. There is every indication that Pennsylvania Glass, ICI Australia, and Kodiak Electric, as discussed in Spring Motors, are still good law.