**NAPORANO IRON & METAL CO. and Commercial Union Insurance Co. a/s/o Naporano Iron & Metal Co., Albany Insurance Co., a/s/o Naporaro Iron & Metal Co., Plaintiffs,**

v.

**AMERICAN CRANE CORPORATION; Formsprag Company, Warner Electric Co., Dana Formsprag Corporation, Dana Corporation, individually and as successor to Formsprag Corporation., Dana Formsprag Corporation, and Warner Electric Co.; Moody Brothers of Jacksonville, Inc., M.D. Moody & Sons, Inc., individually and as successor to Moody Brothers of Jacksonville, Inc., Mobro Marine, Inc., individ-**

ually and as successor to Moody Brothers of Jacksonville, Inc.; XYZ Corporations 1–10, representing fictitious business entities, and John Does 1–10, representing fictitious individuals, Defendants.

No. Civ.A. 98–2457 (JAG).

United States District Court,
D. New Jersey.

Dec. 30, 1999.

As Amended Feb. 18, 2000.

Michael Edward Petrella, Lowenstein Sandler PC, Roseland, NJ, for plaintiff Naporano Iron & Metal Co.

Samuel C. Coluzzi, Nicoletti Hornig & Sweeney, Hackensack, NJ, for intervenor-plaintiff Commercial Union Insurance Company a/s/o Naporano Iron & Metal Co.

James A. Saville, Jr., Hill Rivkins & Hayden, Jersey City, NJ, for intervenor–

plaintiff Albany Ins. Co. a/s/o Naporano Iron & Metal Co.

Robert F. Varady, La Corte, Bundy & Varady, Elizabeth, NJ, for defendant American Crane Corporation.

David S. Osterman, Matthew J. Gehringer, McCarter & English, LLP, Newark, NJ, for defendants Dana Corporation, Formsprag Company, Warner Electric Co., and Dana Formsprag Corporation.

George N. Styliades, Cherry Hill, New Jersey, Michael A. Spero, McCarthy & Schatzman, P.A., Princeton, NJ, for defendants M.D. Moody & Sons, Inc., Moody Brothers of Jacksonville, Inc., and Mobro Marine, Inc.

## OPINION

GREENAWAY, District Judge.

This matter comes before the Court on the motion of defendants Dana Corporation, Formsprag Company, Warner Electric Co., and Dana Formsprag Corporation, American Crane Corporation ("American Crane"), and M.D. Moody & Sons, Inc., Moody Brothers of Jacksonville, Inc., and Mobro Marine, Inc., (collectively, "defendants"), pursuant to Fed. R.Civ.P. 12(b)(6) and 9(b), to dismiss Counts I, III, and V of the complaint. Defendants also seek to strike the claims of plaintiff Naporano Iron & Metal Co. ("Naporano") for punitive damages.[1] For the reasons discussed below, defendants' motion is granted in part and denied in part, and Naporano's request for leave to amend its fraud allegations to comply with Fed.R.Civ.P. 9(b) is granted.[2]

### BACKGROUND

Naporano commenced this action seeking recovery of damages and attorneys' fees and costs stemming from three collapses of a crane that defendants manufactured.[3] The relevant facts, taken from the complaint are as follows:

1. Intervenor-plaintiff Commercial Union Insurance Company a/s/o Naporano Iron & Metal Co. ("Commercial Union") joined in Naporano's opposition to defendants' motion. The designation "Naporano," as used herein, encompasses Commercial Union as well.

2. The Court shall decide defendants' motion without oral argument. See Fed.R.Civ.P. 78.

3. Naporano originally filed this action in the Superior Court of New Jersey, Law Division, Essex County. Defendants properly removed the action to this Court, pursuant to 28 U.S.C. § 1441. Jurisdiction exists, pursuant to 28

On or about February 14, 1992, Naporano, a New Jersey corporation, purchased an American 12220 Crane ("the Crane") manufactured by defendants.[4] The Crane was equipped with a Formsprag Overrunning Clutch (the "original Clutch") and Boom Hoist Brake (the "Brake"), which were designed, manufactured and/or distributed by defendants.

The first collapse occurred on or about September 9, 1993, while Naporano was using the Crane for its intended purpose on a customer's property. The Crane, the original Clutch, and the Brake all failed, causing the Crane's boom to collapse.[5] The Crane itself was damaged as a result, along with the property of the Naporano customer. No person or other property of Naporano was damaged in the collapse.

On or about October 2, 1994, the Crane, the Clutch, and the Brake failed again, causing the boom to collapse a second time. As with the first collapse, this second collapse injured only the Crane itself and the property of Naporano's customer. The boom collapsed for the third time on June 2, 1997, damaging the Crane and certain property of Naporano's customer. Once again, no person or other property of Naporano was injured.[6]

At some point in time, unspecified in the complaint, Defendants determined that the Clutch was defective. Defendants recalled the Crane and promised to provide Naporano with a non-defective crane with a modified Formsprag Overruning Clutch (the "modified Clutch"). Defendants later determined that the modified Clutch was defective, and recalled it as well. Defendants advised Naporano to resume using the original Clutch and again promised a non-defective crane and Formsprag Overrunning Clutch. Subsequently, defendants advised Naporano not to use either the original Clutch or the modified Clutch and that it should cease "operations entirely." Defendants' directive compelled Naporano to "choose between shutting down its operations and using the defective product." When Naporano informed defendants of this Hobson's choice, defendants denied any wrongdoing and "blam[ed] each other." Although Naporano repeatedly requested a replacement non-defective clutch from defendants, one was never provided.

At some point prior to June 2, 1997 (again unspecified in the complaint) "it became apparent" that the Brake was also defective. American Crane promised to provide Naporano with the first redesigned "unit," made with a non-defective brake. American Crane, however, gave the first redesigned brake unit to another customer. The third collapse occurred with the defective brake.

*DISCUSSION*

In considering defendants' motion to dismiss for failure to state a claim, the Court must accept as true all the allegations set forth in the complaint and draw all reasonable inferences in favor of Naporano. *See Ford v. Schering–Plough Corp.*, 145 F.3d 601, 604 (3d Cir.1998). A motion to dismiss, pursuant to Rule 12(b)(6), will only be granted if it appears that Naporano

U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000.

4. Unless specifically noted, the complaint does not distinguish among the defendants.

5. The boom of a crane is the large, projecting metal beam used to maneuver equipment into the desired position. *See* Webster's Third New Int'l Dictionary 253, 2182 (1993).

6. Although the complaint does not so indicate, following each collapse, Naporano compensated the customer for the damage to its property. *See* Naporano Opp.Br. at 10–11. As discussed in Part I(C) below, the fact that Naporano compensated *its* customer is irrelevant to the resolution of this motion. Thus, the Court need not consider that fact—alleged only in argument—and need not thereby convert this motion into one for summary judgment. *See Robinson v. Dalton*, 107 F.3d 1018, 1021 (3d Cir.1997) (noting general rule that consideration of matters outside of pleadings will convert motion to dismiss into motion for summary judgment).

could not prove any set of facts in support of its claims entitling it to relief. *See Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir. 1996); *see also Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

## I. *Naporano's Tort Claims*

### A. *The Economic Loss Doctrine*

In Count I, Naporano asserts a products liability claim against defendants under New Jersey's Products Liability Act, N.J.S.A. § 2A:58C–1 to –11 (West 1987 and Supp.1999) (the "PLA").[7] Naporano charges defendants with defective design and manufacture of the Crane and its component parts, as well as the failure to provide adequate warnings. In Count V, Naporano asserts a negligence claim, charging defendants with breaching their duties of care to Naporano in the assembly, monitoring, and repairing of the Crane. Defendants contend that the PLA is the exclusive source of products liability and bars Naporano's tort claims, as it limits tort remedies to harm caused by a product defect resulting in "physical damage to property, other than to the product itself." N.J.S.A. § 2A:58C–1(b)(2). Defendants maintain that because Naporano alleges only damage to the Crane itself and to the property of a third-party, Naporano's claims are excluded from the PLA and, therefore, not actionable in tort. The PLA, they argue, embodies the "economic loss" doctrine, which limits Naporano's recovery to its contractual remedies.

Under the economic loss doctrine, a plaintiff seeking relief for damages sustained from the purchase of a defective product is limited to contractual remedies under the Uniform Commercial Code.[8]

Where the defective product fails—and harms only the product itself—the purchaser has lost only the benefit of bargain. This harm is deemed "economic loss," for which contract damages are considered sufficient. *See Alloway v. General Marine Indus., L.P.,* 149 N.J. 620, 627–28, 695 A.2d 264 (1997). Economic loss encompasses suits to recover damages for repair costs, replacement of defective goods, inadequate value, consequential loss of profits, and "the diminution in value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold." *Alloway,* 149 N.J. at 627, 695 A.2d 264 (citation omitted).

The New Jersey Supreme Court first approved the economic loss doctrine in *Spring Motors Distribs., Inc. v. Ford Motor Co.,* 98 N.J. 555, 489 A.2d 660 (1985), and recently reaffirmed its commitment to the theory in *Alloway.* The New Jersey Legislature embraced the economic loss doctrine in enacting the PLA in 1987, "to establish clear rules with respect to certain matters relating to actions for damages for harm caused by products." N.J.S.A. § 2A:58C–1(a). Insofar as it is relevant to this case, "harm" under the PLA encompasses "physical damage to property, other than to the product itself." N.J.S.A. § 2A:58C–1(b)(2)(a).

In *Spring Motors,* the court limited a commercial purchaser's damages from a defective product to contractual remedies under the U.C.C. "The considerations that give rise to strict liability do not obtain between commercial parties with comparable bargaining power." *Spring Motors,* 98

---

**7.** The PLA covers actions "brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty." N.J.S.A. § 2A:58C–1(b)(3). Accordingly, in asserting this claim, Naporano does not specify whether its claim is premised upon strict liability or negligence. The PLA provides that a manufacturer or product seller shall be liable upon proper proof "that the product causing the harm was

not reasonably fit, suitable or safe for its intended purpose because [of a defect in manufacture, warning, or design]." N.J.S.A. § 2A:58C–2.

**8.** New Jersey has adopted the U.C.C. to govern commercial transactions such as this purchase and sale of goods. *See generally* N.J.S.A. §§ 12A:2–102, 2–105 (West 1962).

N.J. at 576, 489 A.2d 660. This rationale extended to the plaintiff's negligence claim as well. *See id.* at 581–82, 489 A.2d 660. The court reasoned that in enacting the U.C.C., the New Jersey Legislature "adopted a carefully conceived system of rights and remedies to govern commercial transactions." *Id.* at 577, 489 A.2d 660. The duties imposed and remedies established under the U.C.C. reflect "a policy choice that economic losses inflicted by a seller of goods are better resolved under principles of contract law." *Id.* at 579, 489 A.2d 660. Permitting a commercial purchaser to supplement contractual claims with tort remedies would allow it to "obtain a better bargain than it made." *Id.* at 576, 489 A.2d 660.

In *Alloway*, the court expanded the reach of the economic loss doctrine in New Jersey. There, unlike *Spring Motors*, the plaintiff was not a commercial purchaser, but an individual who sued in contract and tort to recover his economic loss from the manufacturer of his yacht after the boat sank. The *Alloway* court held that an individual plaintiff also was limited to remedies under the U.C.C. when seeking to recover for purely economic loss. *See Alloway*, 149 N.J. at 642–43, 695 A.2d 264.[9] The *Alloway* court engaged in an extensive discussion of the policies embodied in tort and contract law and the reasoning behind limiting recovery for purely economic loss solely to contractual remedies. As in *Spring Motors*, the court in *Alloway* recognized that the adoption of the U.C.C. reflected the state legislature's "attempt to strike the proper balance in the allocation of the risk of loss between manufacturers and purchasers for economic loss arising from injury to a defective product." *Alloway*, 149 N.J. at 629, 695 A.2d 264. Because the court found nothing to indicate that the parties' relative bargaining power was greatly disproportionate, it held that the parties contractual allocation of risk

would govern recovery for economic loss. *See id.* at 628, 695 A.2d 264.

Here, Naporano seeks to recover in contract and in tort for damage sustained by the Crane itself and by Naporano's customer when the Crane's boom collapsed. Defendants assert that the PLA expressly excludes these tort claims for economic loss. The PLA, however, was "not intended to codify all issues relating to product liability...." N.J.S.A. § 2A:58C–1(a). The *Alloway* court expressly recognized the continuing presence of other remedies: "Although the [PLA] excludes physical damage to the product itself from the [statutory] definition of harm, the Legislature did not intend to codify in the [PLA] all common-law remedies." *Alloway*, 149 N.J. at 640, 695 A.2d 264.

Thus, Naporano's claims for damages to the allegedly defective product itself are not automatically precluded by their exclusion from the PLA. *Alloway*, however, did not answer the question of when such a tort cause of action may be pursued. *See id.* at 638, 695 A.2d 264 (leaving unresolved whether U.C.C. or tort law controls "when a defective product poses a serious risk to other property or persons, but has caused only economic loss to the product itself"). Naporano puts forth two theories for why its claims should withstand defendants' motion to dismiss. Naporano first argues that because the Crane failed in a "sudden and calamitous manner," tort law—with its underlying policy of deterrence—should control. Naporano then argues that because other property was, in fact, damaged during the Crane collapses, "harm" occurred within the statutory definition.

## B. *"Sudden and Calamitous" Exception*

In extending the economic loss doctrine to consumer transactions in *Alloway*, the New Jersey Supreme Court did not need to address the question of whether a sud-

---

9. The *Alloway* court thus rejected the oft-criticized holding in *Santor v. A & M Karagheusian*, 44 N.J. 52, 207 A.2d 305 (1965), which permitted private consumers to assert tort claims for economic loss. *See Alloway*, 149 N.J. at 630–31, 695 A.2d 264.

den and calamitous accident that ultimately injured solely the defective product—but posed a serious risk to other property or persons—may be rectified in tort.[10]  In the absence of an authoritative decision of the New Jersey Supreme Court on this issue, in accordance with *Erie R.R, Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), this Court must determine how that court would resolve the issue upon the facts here.  *See Scotts African Union Methodist Protestant Church v. Conference of African Union First Colored Methodist Protestant Church*, 98 F.3d 78, 92 (3d Cir.1996) (stating that where applicable state law is unclear, federal court sitting in diversity must predict how state's highest court would rule).

To aid the Court in this endeavor, defendants point to the recent decision of the New Jersey Appellate Division in *Goldson v. Carver Boat Corp.*, 309 N.J.Super. 384, 707 A.2d 193 (App.Div.1998), addressing this precise issue.  There, the plaintiff had purchased a forty-foot powerboat "as is" at a public auction.  Over a year later, plaintiff and his son docked the boat following a "long hard run," and "noticed a spark emanating from the engine compartment."  *Id.* at 386–87, 707 A.2d 193.  They soon discovered that the entire engine compartment was enveloped in smoke.  Although the fire was eventually controlled, the boat suffered major damage, and plaintiff ultimately sold it for scrap.  *Id.* at 387, 707 A.2d 193.  Plaintiff brought tort claims against the bankrupt boat manufacturer's successor-in-interest, as well as against the company that had converted the engine to maritime use.

The *Goldson* defendants moved for summary judgment, arguing that plaintiff's tort claims to recover economic loss were barred.  The *Goldson* court answered the

question left unresolved in *Alloway*, and held that irrespective of the way the damage occurs, where damage is confined to the allegedly defective product itself, remedies are confined to contract law.

> Where, as here, there is no substantial disparity in bargaining power, and the only damage caused by the defective product is to the product itself, contract law, and the law of warranty in particular, is best suited to set the metes and bounds of appropriate remedies.  Damage to a product itself is most naturally understood as a warranty claim because the cause of action rests on the premise that the product has not met the customer's expectation.

*Goldson*, 309 N.J.Super. at 397, 707 A.2d 193.  There is no suggestion that Naporano and defendants possessed unequal bargaining power.  Applying *Goldson* here, Naporano's claim for damage to the Crane would be limited to breach of warranty.

On the other hand, Naporano steers this Court to *Consumers Power Co. v. Curtiss–Wright Corp.*, 780 F.2d 1093 (3d Cir.1986).  In *Consumers Power*, the Third Circuit construed the economic loss doctrine in New Jersey following *Spring Motors* and predicted that New Jersey would permit tort claims for accidental damage to a defectively repaired engine.  In *Consumers Power*, one of the plaintiff's power-generating engines exploded during repairs and testing subsequent to the defendant's initial repairs to the engine's compressor disc.  The explosion—caused by deficient repairs to the disc—greatly reduced the engine's market value, but did not injure people or other property.  *See Consumers Power*, 780 F.2d at 1095.  The absence of other damage, according to the court, was "pure fortuity," and the court held that the economic loss doctrine would not control in

---

**10.**  Borrowing language from the Third Circuit in *Consumers Power Co. v. Curtiss–Wright Corp.*, 780 F.2d 1093, 1099 (3d Cir.1986), Naporano argues that the "sudden and calamitous" failure of an "unreasonably dangerous product" such as the Crane is excepted from the economic loss doctrine.  There is no precise definition of what constitutes "sudden and calamitous," nor is it a universal term.  Discussions of this question sometimes refer to this category of product damage as "accidental property damage."  *See, e.g., Consumers Power*, 780 F.2d at 1098.

circumstances such as those where the product's "failure caused a sudden, violent and calamitous accident which posed a serious threat to persons and property." *Id.* at 1099.[11]

Hence, both *Goldson* and *Consumers Power* squarely address the issues raised in Naporano's quest to recover tort damages for injuries sustained by the Crane when the boom collapsed. Naporano contends that the Third Circuit's pronouncement in *Consumers Power* binds this Court, irrespective of subsequent developments in either New Jersey's intermediate courts or in general theories on economic loss. Defendants counter Naporano's *Consumers Power* argument solely with a discussion of the New Jersey Appellate Division's decision in *Goldson* and the Supreme Court of the United States' reasoning in *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), *see infra* at 503. Indeed, defendants' briefs never even cite *Consumers Power.* Despite defendants' lack of diligence, in light of this clear conflict, this Court will consider whether developments in New Jersey law indicate that its highest court would follow *Goldson* and reject the sudden and calamitous exception.

■ Although Naporano correctly notes that this Court is constrained to follow and apply the decisions of the Court of Appeals for the Third Circuit, Naporano overstates its argument. This Court need not follow *Consumers Power* if it is clear that the

present state of New Jersey law is such that a different result is clearly dictated.

In *Robinson v. Jiffy Executive Limousine Co.*, 4 F.3d 237, 239 (3d Cir.1993), the Third Circuit affirmed the District Court's decision, which "declined to follow" Third Circuit precedent on the issue before it—whether New Jersey's "incompetent contractor" exception to imputed liability extended to financial incompetence. Years earlier, in *Becker v. Interstate Properties*, 569 F.2d 1203 (3d Cir.1977), the Court of Appeals had predicted that the New Jersey Supreme Court would include financial incompetence within the exception and permit the imposition of liability. The *Robinson* court, as the District Court had below, considered changes in New Jersey's law, focusing particularly on two more recent decisions of New Jersey's intermediate appellate courts that rejected *Becker*'s prediction, and held that liability could not be imputed due to financial irresponsibility. *See Robinson*, 4 F.3d at 240–41.[12] In light of those developments, the Third Circuit agreed that the state's highest court would see things differently, and affirmed the District Court. *See id.* at 242–44; *see also Scotts African Union Methodist Protestant Church*, 98 F.3d at 92 (noting that diversity court making *Erie* prediction "may diverge from existing precedent when there is sufficient evidence that the highest state court would be willing to entertain a change in its common law") (citation omitted); *Hakimoglu v. Trump*

11. In reaching its result, the *Consumers Power* court also focused on the circumstances surrounding the contractual warranty purported to exist between the parties. A sales brochure allegedly sent to the plaintiff by the defendant guaranteed that repairs would be "free from defective workmanship" and limited defendant's liability to fifteen months. The record, however, was devoid of evidence that the brochure had ever been received, let alone agreed to by Consumers Power. *See id.* at 1096, 1099. Absent an express bargain to limit liability, the court found that the concerns that had prompted New Jersey to adopt the economic loss doctrine—that is, "if a commercial party could recover in strict lia-

bility for economic loss, it would obtain a greater economic benefit than it had contractually bargained for"—were not present *Id.* at 1099 (citing *Spring Motors*, 98 N.J. at 577, 489 A.2d 660). Such circumstances are not present in this case between sophisticated commercial parties able to negotiate the terms of this sale of goods at arms-length.

12. The District Court in *Robinson* had also distinguished the facts before it from those in *Becker*, finding that the circumstances before it militated against the imposition of additional liability, whereas circumstances in *Becker* had favored it. *See Robinson*, 4 F.3d at 242.

*Taj Mahal Assocs.*, 876 F.Supp. 625, 630 (D.N.J.1994) ("When a federal court is applying state law and there is persuasive evidence that the state law has undergone a change, the federal court is not bound by a previous decision, if that decision reflected reliance on state law prior ·to its modification.") (citing *Robinson*), *aff'd,* 70 F.3d 291 (3d Cir.1995).[13]

Thus, in light of the significant intervening developments in New Jersey law and tort law generally, this Court must consider whether at this time, the New Jersey Supreme Court would approve a "sudden and calamitous" exception to the economic loss doctrine. In doing so, this Court "must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *Scotts African Union Methodist Protestant Church,* 98 F.3d at 92 (quoting *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 663 (3d Cir.1980)). Decisions of the state's intermediate appellate courts, while not controlling, should be accorded substantial weight. *See Robinson*, 4 F.3d at 242; *see also Packard v. Provident Nat'l Bank,* 994 F.2d 1039, 1047 (3d Cir.1993) ("it must be recognized that a decision of a lower state court on a point of state law is generally more predictive of what the state supreme court would hold than is a conflicting opinion of a federal court on the same point").

As discussed above, the Appellate Division of the New Jersey Superior Court, "applying New Jersey decisional law," rejected the sudden and calamitous exception last year in *Goldson*. *See Goldson,* 309 N.J.Super. at 394, 707 A.2d 193.[14] In doing so, the *Goldson* court considered the state Supreme Court's holdings in *Spring Motors* and *Alloway,* as well as the Supreme Court of the United States' seminal decision on economic loss and tort liability in *East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 870–71, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). In *East River,* handed down five months *after* the Third Circuit's prediction of New Jersey law in *Consumers Power,* a unanimous Court applied the economic loss doctrine in admiralty and rejected the "intermediate and minority" approach that permitted tort actions where the product itself was injured in a sudden and calamitous manner. The Court found unsatisfactory any "distinction that rests on the manner in which the product is injured. We realize that the damage may be qualitative, occurring through gradual deterioration or internal breakage. Or it may be calamitous. But either way, since by definition no per-

---

**13.** The Court has reviewed the precedents Naporano cites to support its argument that *Consumers Power* ties this Court's hands. These decisions, issued by the Court of Appeals for the Fifth Circuit and district courts in Pennsylvania and Texas, are argued out of context and are not persuasive here. For example, in *Batts v. Tow–Motor Forklift Co.,* 66 F.3d 743 (5th Cir.1995), the court refused to set aside a judgment under Fed.R.Civ.P. 60(b) based on a change in state law handed down after entry of the judgment, adopting the contrary position to the federal court's earlier *Erie* prediction. That case, which focused on the standards of Rule 60(b) and when a judgment should be set aside, is inapposite. The most persuasive case Naporano cites is *Sprague, Levinson & Thall v. Advest, Inc.,* 623 F.Supp. 11 (E.D.Pa.), *aff'd without opinion,* 780 F.2d 1016 (3d Cir.1985), in which the court applied the Third Circuit's prediction of Pennsylvania law on the issue before it, despite

two more recent intermediate state appellate court decisions to the contrary. *Sprague,* however, was factually distinct from the newer state court cases on two key issues. Here, in light of the factual distinctions operating in *Sprague,* the decided shift in the law of economic loss—both in New Jersey and nationwide—since the Third Circuit's 1986 prediction of how the state's highest court would rule, and more recent Third Circuit authority on predicting state law, this Court declines to adopt the reasoning of *Sprague.*

**14.** Indeed, courts nationwide have long grappled with the question of whether to carve out such an exception to the economic loss doctrine. *See generally* Restatement (Third) of the Law of Torts § 21, reporter's notes (1998) (discussing case law on the "intermediate" position).

son or other property is damaged, the resulting loss is purely economic." *East River*, 476 U.S. at 870, 106 S.Ct. 2295. Thus, the Court limited admiralty plaintiffs to contractual remedies when the defective product alone is damaged, even if "the harm to the product itself occurs through an abrupt, accident-like event." *Id.*[15]

■ The Supreme Court of the United States' holding in an admiralty action does not bind this Court in a diversity case applying New Jersey law. Nevertheless, its reasoning is persuasive. If the damage to a product is purely economic, and the parties are of relatively equal bargaining power, their contractual agreement—and the allocation of risk contemplated therein—should govern, regardless of the manner in which the damage occurred. Given the parties here, the rationale for limiting a party to its contractual remedies for economic loss remains firmly intact. *See, e.g., Spring Motors*, 98 N.J. at 579–80, 489 A.2d 660.[16]

*Goldson* was the first New Jersey court to address this issue since *Alloway* broadened the reach of the economic loss doctrine by sweeping away any distinction between commercial and private consumers and limiting a consumer's claims for economic loss to contractual warranties.

*See Alloway*, 149 N.J. at 642–43, 695 A.2d 264. Moreover, in discussing—but leaving unresolved—the question presently before this Court, *Alloway* did not discuss *Consumers Power*. Rather, it discussed the Supreme Court's reasoning in *East River*, which rejected the "sudden and calamitous" exception, and the Restatement's implicit adoption of that logic. *See Alloway*, 149 N.J. at 629, 695 A.2d 264.[17] The Restatement does accord with *East River*, as it creates no exception for "sudden and calamitous" economic loss. *See generally* Restatement (Third) of Torts § 21. In addition, in discussing the rationale behind the economic loss doctrine, the *Alloway* court repeatedly cited *East River*. *See, e.g., Alloway*, 149 N.J. at 630, 695 A.2d 264 (noting that the U.C.C.'s "comprehensive scheme offers significant protection to consumers while insuring that merchants are not saddled with substantial and uncertain liability") (citing *East River*).[18]

Finally, and significantly, *Consumers Power* was decided nearly fourteen years ago, in the wake of *Spring Motors*, but before *East River*. Since then, the New Jersey legislature enacted the PLA, *East River* has been decided and adopted in an ever-increasing number of jurisdictions, and *Alloway* has expanded the reach of the economic loss doctrine in New Jer-

15. In *Goldson*, the defendants founded their argument against tort liability on both maritime and New Jersey law. Under *East River*, it is clear that if maritime law controlled, the plaintiff would be limited to his contractual remedies for the economic loss from the fire on his boat. The *Goldson* court reasoned that New Jersey law would lead to the same result.

16. Moreover, a "sudden and calamitous" exception would produce a quagmire of litigation struggling to discern where along the accident spectrum a defective product's damage fell.

17. *Alloway* further noted that a comment to the Restatement recognized the existence of minority arguments that products liability law should control in such circumstances because of the potential danger involved. *See Alloway*, 149 N.J. at 639, 695 A.2d 264; *see also*

Restatement (Third) of Torts § 21 cmt. d (1998) ("A plausible argument can be made that products that are dangerous, rather than merely ineffectual, should be governed by the rules governing products liability law. However, a majority of courts have concluded that the remedies provided under the Uniform Commercial Code ... are sufficient.").

18. This Court is not persuaded by plaintiff's argument in its Sur-reply that the *Alloway* court's failure to depart from its comments in *Spring Motors* despite *East River* is at all relevant. As an initial matter, *Spring Motors* never approved a "sudden and calamitous" exception. Moreover, neither party in *Alloway* alleged that the damage occurred in a sudden and calamitous manner. Thus, the court's refusal to resolve this question is indicative only of its unwillingness to decide issues not properly before it.

sey.[19] In light of all of the above, this Court believes that the New Jersey Supreme Court would follow *East River* as well—at least where, as here, the parties are of relatively equal bargaining power. Under this *Goldson* and *East River* view, New Jersey law contains no "sudden and calamitous" exception to the economic loss doctrine. Thus, insofar as it seeks redress in tort for damage to the Crane, Naporano has not stated a claim under New Jersey law upon which relief may be granted, and Counts I and V must be dismissed.

## C. *"Other Property" Exception*

Defendants contend that Naporano has further failed to state a claim because the property of third parties does not fall within the "other property" exception to the economic loss doctrine. *See* N.J.S.A. § 2A:58C–1(b)(2). Naporano argues that because the property of a third party was injured, it may recover, in tort, the entire economic loss. This Court disagrees.

There are few precedents—in New Jersey or elsewhere—addressing whether a party may assert a products liability claim for third-party damage that accompanies injury to the defective product itself.[20]

This dearth of case law likely reflects the fact that few plaintiffs would have standing to assert a claim for damages to the property of another, not the novelty of this question.[21]

The Restatement's economic loss provisions expressly conflict with Naporano's position. Under the Restatement approach, "harm to persons or property includes economic loss if caused by harm to ... the *plaintiff's property other than the defective product itself.*" Restatement (Third) of Torts § 21(c) (emphasis added). Although not similarly explicit, the absence of such specific language in the PLA does not imply that the New Jersey Legislature altered the traditional principle that a party may only assert a claim for its own injuries. The statute's plain language does not indicate that the property of another may serve as a basis for an exception to the economic loss doctrine. Indeed, if the Court were to permit such an expansive exception, it would require some firm basis in the legislative history and legal precedent. Naporano has pointed to none.

Naporano argues generally that disallowing such tort claims is inconsistent with New Jersey's tort jurisprudence. To the

---

**19.** One of the primary cases relied upon by the *Consumers Power* court in predicting New Jersey law, *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165 (3d Cir.1981), bears discussion. In *Pennsylvania Glass,* the Third Circuit predicted that Pennsylvania would allow tort causes of action for "sudden and calamitous damage to a product caused by its defective condition." *See Consumers Power,* 780 F.2d at 1099 (citing *Pennsylvania Glass* ). Following *East River,* which "flatly rejected" *Pennsylvania Glass,* the Court of Appeals reconsidered its prior reasoning and concluded that "the United States Supreme Court's analysis [in *East River* ] is so persuasive that it will be followed by Pennsylvania courts." *Aloe Coal Co. v.. Clark Equip. Co.,* 816 F.2d 110, 117, 118 (3d Cir.1987).

**20.** *Myrtle Beach Pipeline Corp. v. Emerson Elec. Co.,* 843 F.Supp. 1027, 1055–56 (D.S.C. 1993), *aff'd,* 46 F.3d 1125 (4th Cir.1995), held that injury to third-party property did not transform economic loss into damage redressable in tort. In reaching this result, the court cited language in several cases that made

clear that the party asserting a tort claim for economic loss was the same party that suffered personal injury or injury to other property. Those cases, however, did not expressly so hold.

**21.** Naporano cites a single case from a Massachusetts intermediate appellate court to demonstrate lack of consensus among the courts on whether third-party injury permits tort recovery for economic loss. That case, *Priority Finishing Corp. v. LAL Constr. Co.,* 667 N.E.2d 290 (Mass.App.1996), addresses the unique circumstances of the law of bailments. There, the court sustained the plaintiff's tort claims for damage to third-party property resulting from defendant's alleged negligence, and for which the plaintiff had reimbursed the owner. Significantly, as the bailee, the plaintiff had acquired a possessory interest in the damaged property—and thus the court held it had a right to recover notwithstanding the economic loss doctrine. *See id.* at 292. Naporano has alleged no facts to show it was a bailee of its customer's injured property.

contrary, a third-party injured by a defective product remains able to exercise the full panoply of tort relief available under state law to assert claims against the manufacturers of defective products. New Jersey's courts and its Legislature have agreed that contractual remedies are sufficient to make parties whole following economic loss. The fact that Naporano reimbursed its customer for the harm cannot sweep away those principles. Indeed, if it could, both the economic loss doctrine and the U.C.C. would be rendered powerless, as parties could easily avoid their bargained-for agreements with a simple reimbursement.[22]

█ In light of the foregoing, the Court finds that the PLA and New Jersey common law embody the same principles as the Restatement and do not permit tort recovery for economic loss when the "other property" harmed is not that of the plaintiff.[23] Accordingly, Counts I and V must be dismissed.

### D. *Ancillary Negligence*

In Naporano's final attempt to sustain its tort claims, it argues that even if the Court dismisses tort claims related to harm from the defective product, insofar as Naporano seeks recovery from harm suffered from "ancillary negligent conduct" in the assembling, repairing, maintaining, and monitoring the product, the claim is not for "harm" caused by a product and, thus, is not subsumed by the PLA.

In 1995, the New Jersey Legislature amended the PLA, broadening the definition of "product seller" to bring certain product servicers within the statute. *See* N.J.S.A. § 2A:58C–8 (West Supp.1999) ("Product seller means any person who, in the course of a business conducted for that purpose: sells, distributes; leases; installs; prepares or assembles a manufacturer's product according to the manufacturer's plan, intention, design, specifications or formulations, blends; packages; labels; markets; repairs; maintains or otherwise is involved in placing a product in the line of commerce."). A product seller shall be held liable under the PLA if it "knew or should have known of the defect in the product which caused the injury, death or damage or the plaintiff can affirmatively demonstrate that the product seller was in possession of facts from which a reasonable person would conclude that the product seller had or should have had knowledge of the alleged defect." N.J.S.A. § 2A:58:C–9(d)(2).

Thus, claims related to defendants' actions in assembling, repairing, maintaining or monitoring the Crane would appear to be subsumed by the PLA. Another court in this District recently addressed this issue in *Thomas v. Ford Motor Co.*, 70 F.Supp.2d 521 (D.N.J. 1999). In *Thomas,* the court denied Ford's motion to dismiss plaintiff's claim for negligent airbag installation, brought after plaintiff's pregnant wife died from injuries sustained when the

---

**22.** Naporano argues that in particular, because it compensated its customer for the damages the customer sustained from the Crane's three collapses, it has suffered a cognizable harm. As described in note 6, *supra*, the fact of reimbursement does not appear in the pleadings, and thus may not be considered by this Court without turning the motion into one for summary judgment. The above analysis demonstrates that the "other property" exception does not extend to third-party property, irrespective of any reimbursement. Thus, even if the Court were to consider facts beyond those in the complaint, Naporano's tort claim would not survive.

**23.** Naporano also suggests that because traditional subrogation principles permit a subrogee to sue a wrongdoer for harm to the subrogor, injuries to third-party property constitute "other property" and remove Naporano's injuries from the realm of economic loss. This Court is not considering the question of whether that third party could assert claims for the losses it incurred or whether Naporano as a purported subrogor could seek tort damages for that injury—no subrogation rights are alleged in the complaint. Rather, the only issue is whether Naporano may assert tort claims against the manufacturer for damage to the Crane because of damage to third-party property. Subrogation is wholly inapplicable here.

**506**

airbag inflated during a minor car accident. The *Thomas* court discussed *Ramos v. Silent Hoist & Crane Co.*, 256 N.J.Super. 467, 607 A.2d 667 (App.Div.1992), which held that a product installer was not within the pre-amendment PLA and permitted a claim for negligent installation against the installer. In *Ramos*, the only deficiency was alleged to have occurred in the installation—not in the manufacture or design of the product. *Thomas*, 1999 WL 1041528 at *8. *Thomas* held that the *Ramos* court's reasoning in sustaining a separate cause of action for negligent conduct survived the amendments to the PLA because "the amendment presupposes the existence of a defective product." *Id.* If there was no defect, the PLA would not apply. Thus, the *Thomas* court concluded that if the injuries were demonstrated to have resulted from negligent installation of a non-defective airbag, the plaintiff would be entitled to recover against Ford.[24]

■ Even if this Court were to follow *Thomas*, Naporano's negligence claim could not stand. Here, unlike *Thomas* or *Ramos*, the entirety of Naporano's action is premised on a defect in the Crane. Indeed, Naporano clearly has tailored its allegations to the language of the PLA that expanded "product seller" to cover non-manufacturers who are negligent in connection with a defective product. Naporano did not plead its case in the alternative or articulate a theory of "ancillary negligent conduct" in its complaint. Rather, it has claimed throughout that the Crane and its component parts were defective. Therefore, Naporano's negligence claim, as asserted in Count V, is subsumed

entirely by the PLA, and must be dismissed.

## II. *Naporano's Consumer Fraud Act Claim*

Defendants have also moved to dismiss Naporano's claim brought under the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8–1, *et seq.* (West 1989 & Supp.1999) (the "NJCFA"). Count III charges a violation of the NJCFA, alleging that defendants misrepresented and made false promises concerning the safety, quality, and capabilities of their products, the suitability of these products for Naporano's needs and the defendants' ability and willingness to redesign defective products and accommodate Naporano's business needs. Defendants argue that Naporano has failed to state a NJCFA claim for several reasons. First, defendants contend that Naporano has failed to allege the requisite "substantial aggravating circumstances" in connection with the alleged contractual breaches by defendants. Second, defendants assert that Naporano is not a "consumer" within the definition of the NJCFA, and thus is not protected by its terms. Finally, defendants argue that Naporano has failed to satisfy the specific pleading requirements of Fed.R.Civ.P. 9(b).

The NJCFA protects consumers against "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression of omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . . of any merchandise. . . ." N.J.S.A. § 56:8–

---

24. The treatise cited by Naporano does indicate that, notwithstanding the PLA, New Jersey permits certain tort claims for negligent conduct related to a product where the harm stems from the conduct, rather than the product. *See* William A. Dreier, et al., New Jersey Products Liability & Toxic Torts Law § 1:2–2 at 10–11 (2000 ed.) (1999). Naporano also cites *Cartel Capital Corp. v. Fireco of N.J.*, 81 N.J. 548, 410 A.2d 674 (1980), in support of its position. But *Cartel* pre-dates the PLA,

and thus does not resolve the question of whether the PLA permits an independent negligence claim for negligent conduct related to the product. Likewise, *Parks v. Pep Boys*, 282 N.J.Super. 1, 659 A.2d 471 (App.Div.1995), also cited by Naporano, is inapposite. There, no product defect was alleged—negligence was claimed only in the sale of Freon to a minor—and the court therefore did not address the issue of the PLA. *See Parks*, 282 N.J.Super. at 7, 8 n. 1, 659 A.2d 471.

2. Prevailing plaintiffs are entitled to treble damages. N.J.S.A. § 56:8–19. Naporano alleges that defendants' actions in connection with the replacement of their defective products constitute unconscionable commercial practices, deception, fraud, false pretense, false promise, and misrepresentation in violation of the NJCFA. The Act is worded in the disjunctive, and requires only that Naporano prove that defendants committed one of the prohibited practices to sustain its claim. *See Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 19, 647 A.2d 454 (1994).

### A. *Substantial Aggravating Circumstances*

A claim under the NJCFA requires more than merely a breach of warranty. A plaintiff must allege "substantial aggravating circumstances." *See Suber v. Chrysler Corp.*, 104 F.3d 578, 587 (3d Cir. 1997); *see also Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 18, 647 A.2d 454 (1994); *D'Ercole Sales, Inc. v. Fruehauf Corp.*, 206 N.J.Super. 11, 31, 501 A.2d 990 (App.Div. 1985). In moving to dismiss, defendants point to *D'Ercole Sales*, which held—following trial—that one defendant's refusal to honor its warranty, "offensive though it may be," did not rise to the level of "unconscionable commercial practice" and should not have been submitted to the jury. *D'Ercole Sales*, 206 N.J.Super. at 31, 501 A.2d 990.

The considerations of the *D'Ercole* court in finding that no unconscionable commercial practice had been proven at trial are distinct from this Court's considerations in determining whether Naporano, at the initial pleading stage, has pled "substantial aggravating circumstances" sufficient to survive a motion to dismiss. In *Suber*, the Third Circuit held that the plaintiff had alleged sufficient aggravating circumstances to withstand a motion to dismiss. There, the plaintiff sued under the NJCFA for problems related to suspension problems in a van he had purchased from the defendants. He alleged that after months of denying that the van had problems, defendants' representatives conceded that suspension problems existed, but wrote contradictory information in the official repair report. Plaintiff further alleged that Chrysler had issued a bulletin advising of the need to repair the suspension problems in that model and year of van. Those allegations, if proven, would constitute more than a breach of warranty, and the Court denied the motion to dismiss accordingly. *See Suber*, 104 F.3d at 587

Here, in Count III, Naporano alleges that once it became clear that the original Clutch was defective, defendants "recalled the product" and promised to provide a non-defective Crane with a modified clutch. The modified Clutch was later recalled as well, and Naporano was told to resume using the original Clutch. Subsequently, defendants advised Naporano to cease using the Crane entirely, which would force Naporano to close down it operations. Naporano also makes more specific allegations against defendant American Crane with respect to the Boom Hoist Brake. When a defect in the Brake was discovered, American Crane promised to provide Naporano with its first re-designed unit, which was ultimately provided to a customer other than Naporano. In connection with both of these incidents, Naporano alleges that defendants "misrepresented and issued false promises concerning the safety, quality, and capabilities of their products, the suitability of their products for Plaintiff's application, and their ability and willingness to re-design their defective products and accommodate Plaintiff's business needs." Cplt. at 5 ¶ 9. Naporano further alleges that defendants intentionally and knowingly omitted material information in connection with their products. Cplt. at 6 ¶ 11. Moreover, Naporano alleges throughout its complaint that the alleged defects in the Crane created a hazardous condition.

Taking all of the allegations contained in the Complaint as true and drawing all reasonable inferences in Naporano's

favor, this Court finds that Naporano has alleged more than a simple breach of warranty. If proven, the above allegations could constitute the substantial aggravating factors necessary to prove a violation of the NJCFA. Therefore, defendants' motion to dismiss Count III on this basis is denied.

### B. *Definition of Consumer under the NJCFA*

Defendants next argue that sophisticated commercial entities such as Naporano are not "consumers" protected by the NJCFA. The NJCFA does not expressly define "consumer." *See* N.J.S.A. § 56:8–1 ("Definitions"); *see also J & R Ice Cream Corp. v. California Smoothie Licensing Corp.*, 31 F.3d 1259, 1272 (3d Cir.1994). The Act defines "merchandise" to include "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. § 56:8–1(c). A "person" under the Act includes a "partnership, corporation, company, trust, business entity or association." N.J.S.A. § 56:8–1(d). Any "person" who "suffers any ascertainable loss of moneys or property, real or personal," as a result of one of the practices forbidden under the statute, may bring an action under the NJCFA. N.J.S.A. § 56:8–19.

Although the statutory language makes clear that a company such as Naporano may bring claims for violations of the NJCFA, the question remains whether this transaction between these two large commercial entities for a piece of equipment such as the Crane is subject to the NJCFA. "[I]t is the character of the transaction, rather than the identity of the purchaser which determines if the Consumer Fraud Act is applicable." *J & R Ice Cream*, 31 F.3d at 1273; *accord Marascio v. Campanella*, 298 N.J.Super. 491, 498, 689 A.2d 852 (App.Div.1997) ("Those who purchase these services, whether commercial entities or individual citizens, are 'consumers' in the ordinary as well as statutory meaning of that word.").

The parties have presented multiple authorities on both sides of the issue. Defendants contend that the NJCFA does not apply, relying in large part on language in *J & R Ice Cream* and *BOC Group, Inc. v. Lummus Crest, Inc.*, 251 N.J.Super. 271, 597 A.2d 1109 (Super.Ct., L.Div.1990). In *BOC Group*, the Law Division dismissed a NJCFA claim brought by a corporate plaintiff in connection with problems in the design, engineering, and operation of a $125 million plant built to manufacture needle coke through a refining process that was the subject of a licensing agreement between the parties. While acknowledging that "a corporation may qualify as a person under the Act when it finds itself in a consumer oriented situation," the court held that, in that situation, the NJCFA did not apply. *BOC Group*, 251 N.J.Super. 271, 597 A.2d at 1112. The "complex petroleum refining process" at issue in *BOC Group* was neither a service nor merchandise "sold 'to the public' " such that the plaintiff could invoke the statute's protection. *See id.* at 278, 597 A.2d 1109.

The Third Circuit considered *BOC Group* in interpreting New Jersey law in *J & R Ice Cream*, and held that the NJCFA did not cover the plaintiff-corporation's claims stemming from its purchase of a restaurant franchise from the defendant. According to the Court of Appeals, the term "merchandise" must be examined in light of the "overriding purpose of the Act," and concluded that a franchise purchaser was not the ordinary consumer of merchandise in the marketplace. *See J & R Ice Cream*, 31 F.3d at 1273–74. Moreover, the Court reasoned that even where franchises were available to the general public, their purchase remained excluded from the NJCFA because the item for sale was a business, and not consumer goods and services. *See id.* at 1274; *see also Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 179 F.R.D. 450, 470 (D.N.J.1998) (holding that purchasers of wholesale

goods for resale are not "consumers" within the NJCFA).

Naporano has cited cases where courts have permitted corporate plaintiffs to maintain NJCFA claims for merchandise used in business operations. *See, e.g., Coastal Group, Inc. v. Dryvit Systems, Inc.,* 274 N.J.Super. 171, 179–80, 643 A.2d 649 (App.Div.1994) (denying summary judgment for NJCFA claim brought by condominium developer against seller of prefabricated wall panels); *Perth Amboy Iron Works, Inc. v. American Home Assurance Co.,* 226 N.J.Super. 200, 209, 543 A.2d 1020 (App.Div.1988), *aff'd,* 118 N.J. 249, 571 A.2d 294 (1990) (corporate plaintiff's claims relating to purchase of a yacht covered by the NJCFA); *Hundred East Credit Corp. v. Eric Schuster Corp.,* 212 N.J.Super. 350, 355–57, 515 A.2d 246 (App. Div.1986) (NJCFA covered claims by business related to purchase of computer peripherals).

Although their results are contrary, these two lines of cases are not inconsistent. The "merchandise" at issue here is the Crane (and its component parts). While the statute's enumeration of what constitutes merchandise for its purposes is not exhaustive, the Third Circuit has cautioned courts interpreting the statute that they should not extend its definition to items "wholly foreign to any of the listed examples." *See J & R Ice Cream,* 31 F.3d at 1273 (citation omitted). As noted above, the statute defines merchandise to include "any objects, wares, goods, commodities, services or anything offered directly or indirectly to the public for sale." N.J.S.A. § 56:8–1(c). Thus, if the Crane is an object, ware, or good offered to the public at large, Naporano's claims should survive the motion to dismiss, regardless of whether the Crane is extremely expensive or uncommon.

■ The purchase and sale of a franchise, at issue in *J & R Ice Cream,* involves considerations of markets, location, and on-going relations. Each franchise relationship is thus unique, and is logically excluded from the auspices of the statute. Similarly, the refining method and licensing agreement at issue in *BOC Group* were the products of years of bids, development, and testing. The defendant there could not simply go out and enter a contract for use of the method. By contrast, the trucks at issue in *D'Ercole,* the computer parts at issue in *Hundred East Credit,* and the yachts at issue in *Perth Amboy* constitute the type of merchandise that is generally available to the public—albeit expensive and within the grasp and/or needs of only a limited clientele. Naporano's purchase of the Crane more closely resembles the latter group of cases. Although a crane is a large, expensive piece of machinery, cranes are in use at construction sites across the globe. As the purchaser of the Crane for a business use, Naporano is a "consumer" within the meaning of the NJCFA, and defendants' motion to dismiss on this basis is also denied.

### C. *Rule 9(b)*

Finally, defendants argue that Naporano's NJCFA claim must be thrown out for failing to comply with the pleading requirements of Fed.R.Civ.P. 9(b). Rule 9(b) of the Federal Rules of Civil Procedure requires that all allegations of fraud state the circumstances constituting the fraud "with particularity." Defendants contend that Naporano's allegations are impermissibly vague and thus violate the Rule. Naporano's response is three-fold. First, it contends that the pleading mandate of Rule 9(b) does not apply to fraud claims asserted under the NJCFA. Second, Naporano maintains that even if Rule 9(b) applies, the complaint satisfies its requirements. Finally, Naporano argues that if this Court holds its complaint to be insufficiently particular, it should be granted leave to amend its fraud claims to satisfy Rule 9(b). The Court will address each of these arguments in turn.

Defendants assert, based on *F.D.I.C. v. Bathgate,* 27 F.3d 850 (3d Cir.1994), that

the pleading requirements of Rule 9(b) govern NJCFA claims contained in federal actions. In *Bathgate*, the Third Circuit affirmed the District Court's dismissal for failure to satisfy the particularity requirement of Rule 9(b). *See id.* at 876. There, the plaintiff's NJCFA claim and common law fraud claim were dismissed because the plaintiff failed to identify the speaker of the allegedly fraudulent statement or to allege that additional information necessary to provide more specifics was within the defendant's exclusive control. *See id.* Naporano counters that *Bathgate* is distinguishable because the NJCFA claim there relied on the same allegations as the common law fraud claim (unquestionably subject to 9(b)) and thus both claims were dismissed. Here, Naporano asserts fraud only under the NJCFA, and argues that since its claim is not intertwined with common law fraud, it not subject to the particularity requirement. In the unpublished opinion dismissing the fraud claim, however, the District Court stated that the plaintiff's "New Jersey Consumer Fraud Act claim *and* common law fraud claim are subject to the particularity requirement of Rule 9(b) of the Federal Rules of Civil Procedure." *F.D.I.C. v. Bathgate*, No. 91–2779, 1993 WL 661961, at *2 (D.N.J. July 19, 1993) (emphasis added).[25]

Naporano argues that its claims, in essence, do not "sound in fraud," and are more akin to negligent misrepresentation claims, which are not subject to Rule 9(b). Naporano thus premises its argument on the difference between the elements of fraud under the statute and those at common law.

■ As an initial matter, Count III of Complaint alleges that the defendants' actions with respect to repairs to the Crane constituted "unconscionable commercial practices, deception, *fraud, false pretense,*

*false promise, and misrepresentation.*" Cplt. at 6 ¶ 10 (emphasis added). Therefore, contrary to its current argument, Naporano has alleged claims "sounding" in fraud. More importantly, the fact that the elements of proof in common law fraud and NJCFA violations differ does not exempt Naporano from the requirement of particularized pleading.

The Third Circuit's discussion of the requirements of Rule 9(b) in *Saporito v. Combustion Engineering Inc.*, 843 F.2d 666 (3d Cir.1988), *vacated on other grounds*, 489 U.S. 1049, 109 S.Ct. 1306, 103 L.Ed.2d 576 (1989), is instructive in this regard. In *Saporito*, the court concluded that the plaintiff's allegations of mail and wire fraud as RICO predicate acts did not satisfy Rule 9(b). *See id.* at 673–75. Agreeing with the plaintiff's argument that the federal mail and wire fraud statutes did not define a "scheme to defraud" in accordance with "any technical standards" and that the conduct "need not be fraudulent on its face," the Court reasoned nevertheless that 9(b) still required that fraud be plead with greater particularity. *Id.* at 675. "The pleading requirement simply mandates that the actions establishing the fraud be pleaded with greater particularity than other pleadings; it has no impact on the definition of fraud itself. Thus, Rule 9(b) does not alter the substantive offense of fraud, but requires detailed allegations of that offense." *Id.* The same logic applies here. Applying Rule 9(b) does not transform NJCFA claims into common law fraud—it merely requires Naporano to detail its fraud allegations to put defendants on notice, which is a principal rationale behind the 9(b) requirement. *See generally Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 288 (3d Cir.1992) (holding that Rule 9(b) applies to allegations of securities' law violations when "grounded in fraud").[26]

---

**25.** The District Court in *Bathgate* did not hold expressly that 9(b) applied. Indeed, there was no discussion of the issue beyond that statement.

**26.** Naporano cites three instances where consumer fraud statutes from other states were not subjected to Rule 9(b)'s pleading requirements. In those cases, unlike this one, the court expressly found that the allegations did

Since Rule 9(b) requires Naporano to allege the circumstances surrounding its NJCFA claim with particularity, this Court must next determine if Naporano's allegations comport with that mandate. Rule 9(b)'s purpose is to provide defendants with notice of the precise misconduct that is alleged and to protect defendants' reputations by safeguarding them against spurious allegations of immoral and fraudulent behavior. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir.1997); *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir.1984); *Eli Lilly & Co. v. Roussel Corp.*, 23 F.Supp.2d 460, 491 (D.N.J. 1998).

▮ The requirements of Rule 9(b) may be satisfied if the complaint describes the circumstances of the alleged fraud with precise allegations of date, time, or place. *See Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir.1989) (citing *Seville*, 742 F.2d at 791). Alternatively, plaintiffs must use some means of "injecting precision and some measure of substantiation into their allegations of fraud." *Seville*, 742 F.2d at 791; *see also Saporito*, 843 F.2d at 675 (Rule 9(b) requires "detailed allegations" of fraud).

▮ Pleadings containing collectivized allegations against "defendants" do not suffice. "Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants'." *Eli Lilly*, 23 F.Supp.2d at 492 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)). A plaintiff must plead fraud with particularity with respect to each defendant, thereby informing each defendant of the nature of its alleged participation in the fraud. *See, e.g., Seville*, 742 F.2d at 791; *Strange v. Nationwide Mut. Ins. Co.*, 867 F.Supp. 1209, 1220 (E.D.Pa.1994) (complaint alleging that defendants' agents made fraudulent representations did not satisfy particularity requirements of Rule 9(b)); *see also Jackson Nat'l Life Ins. Co. v. Ligator*, 949 F.Supp. 200, 208 (S.D.N.Y.1996) (branding the plaintiffs' failure to distinguish among the "Ligator Defendants" as an egregious example of prohibited "group pleading" under Rule 9(b)).[27]

Naporano's generalized pleading resembles vague pleadings that the Third Circuit has rejected. In *Saporito*, for example, plaintiffs sued their former employer for inducing them to accept an early retirement package far inferior to a second package that the company was developing at that time, and to which plaintiffs were denied access following their acceptance of the first package. The complaint alleged generally that the defendants had notified certain employees about the under-development package during the option period on the first package. The Third Circuit held that the allegations, which indicated the general content of the representations but not the identity of the speakers or recipients of the information, lacked the requisite detail. *See Saporito*, 843 F.2d at 675.

More recently, in *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658

---

not "sound in fraud." *See, e.g., Mitsubishi Elec. Corp. v. IMS Tech., Inc.*, No. 96–c–499, 1997 WL 630187, at *10 (N.D.Ill. Sept.30, 1997) (Rule 9(b) did not apply to allegations of trade disparagement under Illinois' consumer fraud statute).

27. The Third Circuit, however, has cautioned that the rule should be applied with some flexibility and courts should not require plaintiffs to plead issues that may have been concealed by defendants. *See Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir.1998). Thus, the requirements of Rule 9(b) may be relaxed where factual information is exclusively within the opposing party's knowledge or control. *See Craftmatic*, 890 F.2d at 645. Nonetheless, even under a non-restrictive application of Rule 9(b), a plaintiff must allege that the necessary information lies within defendants' control and those allegations must be accompanied by a statement of facts upon which the allegations are based. *See id.; see also Burlington Coat Factory*, 114 F.3d at 1418 ("even under a relaxed application of Rule 9(b), boilerplate and conclusory allegations will not suffice").

(3d Cir.1998), the court also affirmed dismissal for failure to satisfy Rule 9(b). Despite a fairly detailed discussion of the alleged fraudulent scheme, the *Rolo* complaint had failed to include any specific allegations about the presentations or mailings to plaintiffs in which the fraud was alleged to have occurred. Specifically, the Court noted that the allegations provided no details as to when the representations occurred, by whom or to which plaintiffs, or the content of the alleged misrepresentations. *See id.* at 658–59; *compare Seville* at 791 (holding that the plaintiff satisfied Rule 9(b) "by incorporating into the complaint a list identifying with great specificity the pieces of machinery that were the subject of the alleged fraud").

As in *Saporito* and *Rolo,* Naporano's complaint lacks the requisite detail. Naporano neither alleges that the information is within the control of the defendants, nor specifies which defendants were involved in which misrepresentations.[28] Moreover, Naporano fails to inform defendants of the substance of these alleged misrepresentations.[29] In short, Naporano's pleading suffers from the precise problems that Rule 9(b) aims to prevent. Naporano's failure to plead fraud with sufficient particularity does not allow defendants the opportunity to defend themselves, and thus Count III must be dismissed. *See Rolo* at 659.[30]

**III. *Punitive Damages***

Finally, defendants have asked the Court to strike Naporano's claims for punitive damages, requested in each of the six counts in the complaint. With respect to Naporano's contract law claims for breach of warranty (Count II), breach of implied warranty of good faith and fair dealing (Count IV), and breach of contract (Count VI), defendants contend that New Jersey does not permit punitive damages for breach of a commercial contract. Defendants further argue that in Naporano's tort and fraud claims, Count I, III and V, Naporano has failed to state claims that warrant a punitive damages award.

The propriety of punitive damages is determined by a plaintiff's proof, and ordinarily, dismissal of Naporano's punitive damages claims at this juncture would be premature. *See generally Domm v. Jersey Printing Co.,* 871 F.Supp. 732, 739 (D.N.J.1994) (denying motion for summary judgment on punitive damages as premature because "issue of punitive damages is a fact question which should be decided by a jury"). If, however, the asserted causes of action expressly bar the imposition of punitive damages, dismissal at this stage would be appropriate.

Defendants argue that New Jersey law prohibits the imposition of punitive damages in contract actions.[31] Generally, pu-

---

**28.** In Naporano's brief in opposition to defendants' motion to dismiss, Naporano hints that certain vital information is within the control of the defendants. Even if that argument were fully articulated in the briefs, such allegations are not contained in the complaint and therefore do not satisfy the Third Circuit's more flexible approach to Rule 9(b).

**29.** While the allegations within Count III against American Crane with respect to its promise of the first re-designed Crane do contain a modicum of specificity, the remaining allegations in the complaint lump all "defendants" together and are thus impermissibly imprecise.

**30.** With the admonition that an amended pleading that fails to distinguish among de-

fendants and lacks detail will not withstand a motion to dismiss, Naporano may amend its complaint to satisfy the federal pleading requirement. *See Saporito,* 843 F.2d at 675; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

**31.** Defendants do not contend that the NJCFA prohibits the imposition of punitive damages. Rather, they argue that Naporano's allegations are insufficient to support a punitive damages award. As noted above, whether punitive damages are warranted here is a question of proof, and should not be resolved upon a motion to dismiss. Accordingly, in amending its complaint, Naporano may include a request for punitive damages in its NJCFA claim.

nitive damages are unavailable in contract actions. *See Buckley v. Trenton Saving Fund Soc'y*, 111 N.J. 355, 369–70, 544 A.2d 857 (1988); *Pierce v. Ortho Pharm. Corp.*, 84 N.J. 58, 72–73, 417 A.2d 505 (1980) (punitive damages are "not available under the law of contract"). However, courts have enunciated certain exceptions to that rule dependent on the nature of the parties' relationship or a special duty imposed on the breaching party. *See Sandler v. Lawn–A–Mat Chem. & Equip. Corp.*, 141 N.J.Super. 437, 449, 358 A.2d 805 (App. Div.1976) (listing exceptions permitting imposition of punitive damages for breach of marital contract, breach of statutory duty, or certain breaches by the non-breaching party's fiduciary). The Third Circuit has characterized these exceptions as involving a breach of trust beyond merely a breach of contract. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1194 (3d Cir. 1993) (construing New Jersey law); *W.A. Wright, Inc. v. KDI Sylvan Pools, Inc.*, 746 F.2d 215, 217 (3d Cir.1984) ("These special relationships [for which exceptions had been found] impose a duty of trust upon the contracting entities. It is the breach of this trust, rather than the breach of the contract, which gives rise to an award of punitive damages.").

Beyond those established exceptions, one intermediate appellate court has suggested that a contract case might arise "involving such an aggravated set of facts that punitive damages might be appropriate regardless of the contract form of the cause of action and even though it may be beyond the scope of the recognized exceptions in adjudicated cases." *Sandler*, 141 N.J.Super. at 451, 358 A.2d 805. At least one court within this District has accepted *Sandler* as raising the possibility that under certain facts, punitive damages may be appropriate for a breach of contract. *See Unifoil Corp. v. Cheque Printers & Encoders Ltd.*, 622 F.Supp. 268, 272–73 (D.N.J. 1985) (denying motion to dismiss punitive damages request in breach of warranty claim because "it is theoretically possible to obtain punitive damages on a contract claim given sufficiently 'aggravated circumstances.'") (quoting *Sandler*). Although *Sandler* has been criticized,[32] and even under *Sandler* the circumstances of the breach must be quite extreme to merit punitive damages,[33] this Court cannot hold—at this nascent stage in the litigation—that Naporano can prove no set of facts that might warrant punitive damages. Accordingly, defendants' motion to strike Naporano's requests for punitive damages in Counts II, IV, and VI is denied.[34]

## CONCLUSION

For all of the foregoing reasons, defendants' motion to dismiss is granted as to Counts I, III, and V. In addition, defendants' motion to strike Naporano's requests for punitive damages is denied as moot with regard to Counts I, III, and V, and denied as to Counts II, IV and VI. Naporano's request for leave to amend its complaint to reallege its NJCFA claim, as previously alleged in Count III, is granted.

**32.** *See, e.g., Ellmex Constr. Co. v. Republic Ins. Co.*, 202 N.J.Super. 195, 197, 494 A.2d 339 (App.Div.1985) (denying claim for punitive damages; noting that *Sandler* observations "clearly are dicta"); *W.A. Wright*, 746 F.2d at 218 (rejecting *Sandler's* suggestion of "egregious" conduct exception to bar on punitive damages in contract actions: "[T]o sanction punitive damages on such a 'bad faith' theory would, it seems, allow for punitive damages whenever the contract breach was intentional. Thus, the exception urged by plaintiffs would effectively swallow the rule.").

**33.** Indeed, *Sandler* itself contains language that seemingly precludes punitive damages here. *See Sandler*, 141 N.J.Super. at 451, 358 A.2d 805 ("[P]laintiffs' grievance is founded upon [ ] the breach of a contract between the parties—a contract which creates no special relationship or duty beyond that arising out of any commercial transaction. As such, punitive damages are not recoverable against the breaching party.").

**34.** As this Court has dismissed Naporano's tort claims, it need not consider defendants' request to strike the claims for punitive damages contained therein.

## ORDER

This matter having come before the Court on the motion of defendants Dana Corporation, Formsprag Company, Warner Electric Co., Dana Formsprag Corporation, American Crane Corporation, M.D. Moody & Sons, Inc., Moody Brothers of Jacksonville, Inc., and Mobro Marine, Inc. (collectively, "defendants"), pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b), to dismiss Counts I, III, and V of the complaint and to strike the claims for punitive damages of plaintiff Naporano Iron & Metal Co. and intervenor-plaintiff Commercial Union Insurance Company a/s/o Naporano Iron & Metal Co. (collectively, "plaintiff"); and the Court having considered the parties' submissions; and good cause appearing,

IT IS on this 28th day of December, 1999,

ORDERED that defendants' motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is granted as to Counts I and V and denied as to Count III;

IT IS FURTHER ORDERED that defendants' motion to dismiss Count III, pursuant to Rule 9(b) is granted;

IT IS FURTHER ORDERED that defendants' motion to strike plaintiff's claims for punitive damages is denied as moot with regard to Counts I, III, and V, and denied with regard to Counts II, IV, and VI;

IT IS FURTHER ORDERED that plaintiff's request for leave to amend Count III of the complaint is granted;

IT IS FURTHER ORDERED that plaintiff may file its amended complaint within thirty (30) days of this Order; and

IT IS FURTHER ORDERED that a copy of this Order be served on all parties within (7) days of the date of this Order.